James F. HUNT and Carol
Hunt, Appellants,

v.

UNITED STATES of America.

Catherine Strinni HOLLAR, Appellant,

v.

UNITED STATES of America.

Nos. 79–2049, 79–1282.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 31, 1980.

Decided Aug. 26, 1980.

Rehearing Denied Oct. 29, 1980.

---

Lawrence E. Stewart, Cleveland, Ohio, for appellants in No. 79–2049.

Clifford J. Shoemaker, St. Louis, Mo., for appellant in No. 79–1282. Stephen H. Gilmore, St. Louis, Mo., was on brief for appellant in No. 79–1282.

Thaddeus B. Hodgdon, Atty., U. S. Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., and Jeffrey Axelrad, Atty., U. S. Dept. of Justice, Washington, D. C., were on brief, for appellee in No. 79–2049.

W. Russell Welsh, Atty., U. S. Dept. of Justice, of the bar of the Supreme Court of Missouri, Washington, D. C., pro hac vice, by special leave of court, with whom Barbara Allen Babcock, Asst. Atty. Gen., and Jeffrey Axelrad, Atty., U. S. Dept. of Justice, Washington, D. C., were on brief for appellee in No. 79–1282.

Mark P. Friedlander, Jr., Washington, D. C., for Swine Flu Steering Committee, amicus curiae, urging reversal, in No. 79–1282.

John D. Heffner, Washington, D. C., was on brief for Obermayer, Rebmann, Maxwell & Hippel, amicus curiae, urging reversal, in No. 79–1282.

Before TAMM and WALD, Circuit Judges, and JOYCE HENS GREEN,* United States District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

These cases raise a difficult issue of statutory interpretation: whether members of the military may recover from the United States under the National Swine Flu Immunization Program of 1976 (Swine Flu Act), Pub.L.No.94–380, 90 Stat. 1113 (codified at 42 U.S.C. § 247b(j)–(*l*) (1976)),[1] for injuries resulting from swine flu inoculations with a vaccine that was allegedly manufactured in a negligent or defective manner. Our analysis requires us to consider the Swine Flu Act, the Federal Tort Claims Act (Tort Claims Act), Pub.L.No.79–601, tit. IV, § 401, 60 Stat. 812 (1946) (codified in scattered sections of 28 U.S.C.), and a host of statutory provisions that authorize governmental benefits for service personnel who suffer disability or death.[2] Our task is complicated by the imprecise contours of the doctrine enunciated in *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), which precludes certain claims by military personnel under the Tort Claims

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

**1.** The Swine Flu Act no longer appears in title 42. *See* Health Services and Centers Amendments of 1978, Pub.L.No.95–626, 92 Stat. 3551.

**2.** *See* note 13 *infra.*

Act, and by the lack of congressional guidance in the hasty enactment of the Swine Flu Act. In the end, we are left to do again what the Supreme Court attempted in *Feres*: to construe the most recent legislative enactment "to fit, so far as will comport with its words, into the entire statutory system of remedies against the Government to make a workable, consistent and equitable whole," *Feres v. United States*, 340 U.S. at 139, 71 S.Ct. at 156.

■ In the course of this opinion, we first outline the provisions of the Tort Claims Act, and then trace the evolution of the *Feres* doctrine, which arose under that Act. We thereafter discuss the more recent Swine Flu Act, and, in determining whether the *Feres* doctrine should be applied to claims arising under that Act, we attempt to integrate the various statutory provisions and policies that are implicated in these cases. We emerge from this remedial labyrinth with the conclusion that members of the armed forces are not barred from asserting swine flu claims based on the tortious conduct of a vaccine manufacturer,[3] and we therefore reverse the decisions of the district court that had reached an opposite result.

## I. THE FACTUAL BACKGROUND

We need pause but briefly to recite the salient facts in these cases. James F. Hunt, the appellant in No. 79–2049, and Catherine Strinni Hollar, the appellant in No. 79–1282, each received a swine flu vaccination while on active military duty in the autumn of 1976. Each developed serious maladies, allegedly as a result of the vaccination. Although Hunt remained in the service, Hollar received a medical disability discharge, receiving a fifty percent disability rating. After seeking administrative relief without success, each appellant filed suit against the United States pursuant to the Swine Flu and Tort Claims Acts, alleging governmental liability on the basis of the vaccine manufacturer's negligence or strict products liability. Each suit was transferred to the United States District Court for the District of Columbia. *See generally In re Swine Flu Immunization Products Liability Litigation*, 446 F.Supp. 244 (Judic. Panel on Multidist.Lit.1978). Acting on motions by the Government, the district court separately dismissed each action.[4] These appeals followed.[5]

## II. THE TORT CLAIMS ACT

Inherited from our European forebears, the doctrine of sovereign immunity originated in the belief that it would contradict the sovereignty of the king to allow him to be sued as of right in his own courts. *See* RESTATEMENT (SECOND) OF TORTS, ch. 45A, at 394 (1979) (introductory note). The king could, of course, consent to be sued, and such consent was commonly granted in England even before the American Revolution. *See id.* Some 170 years after ridding itself of kingly rule, our own democratic sovereign finally consented to a general abrogation of the rule that had precluded tort suits against the United States. In 1946, through the passage of the Tort Claims Act, the United States waived its sovereign immunity and agreed to be subject to suit

> for money damages . . . for injury
> or loss of property, or personal injury or

---

3. The Swine Flu Act creates a scheme of substituted liability. *See* pages 589–593 *infra*.

4. After dismissing the claims of both Hunt and Hollar, the district court reversed its position and held in *Brown v. United States*, MDL No. 330, Misc. No. 78–0040, Civ. No. 79–2422 (Jan. 4, 1980) (order), that active duty military personnel are not necessarily barred from recovering from the United States for injuries resulting from swine flu inoculations. As our result today suggests, we believe that the district court's about–face was well–advised. *Cf. Hen-*

---

*slee v. Union Planters National Bank & Trust Co.*, 335 U.S. 595, 600, 69 S.Ct. 290, 293, 93 L.Ed. 259 (1949) (Frankfurter, J., dissenting) ("Wisdom too often never comes, and so one ought not to reject it merely because it comes late.").

5. Although this court did not formally consolidate the separate appeals of Hunt and Hollar, they were argued on the same day before the same panel, and we find it convenient to dispose of both appeals with a single opinion.

death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b) (1976). *See also id.* § 2674.[6]

Under the Tort Claims Act, an injured party must first submit a claim for relief to the appropriate federal agency. *See id.* § 2675(a). If a satisfactory settlement is not achieved at the administrative level, the claimant may bring suit in United States District Court, where the action is tried to the court sitting without a jury. *See id.* §§ 1346(b), 2402, 2675(a). The Government's liability generally is determined in accordance with local law, the Government being treated as though it were a private person. *See id.* § 1346(b); *see also id.* § 2674. The Government is not liable, however, for claims based on strict or absolute liability, *see id.* § 1346(b) (requiring a "negligent or wrongful act or omission" by an employee of the Government), *construed in*

*Dalehite v. United States,* 346 U.S. 15, 44–45, 73 S.Ct. 956, 972, 97 L.Ed. 1427 (1953),[7] nor is it liable for punitive damages, *see* 28 U.S.C. § 2674 (1976). Moreover, the Act lists a number of express exceptions to its otherwise broad nullification of the doctrine of sovereign immunity. *See id.* § 2680.[8] The Act provides time limits for the filing of administrative claims and subsequent lawsuits, *see id.* § 2401(b), and places a limitation on the amount of fees that may be received by a claimant's attorney, *see id.* § 2678.

## III. THE *FERES* DOCTRINE

### A. The Tort Claims Act's Requirement of Analogous Private Liability

Rather than leave to the courts the task of developing a body of federal tort law under the Tort Claims Act, Congress determined that the United States would be liable for the acts of its employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b) (1976). *See also id.* § 2674. Under this language, the Government

---

**6.** Prior to the enactment of the Tort Claims Act, a person injured by a negligent federal employee typically faced the difficult task of either attempting to recover from the employee himself or seeking direct relief from Congress in the form of a private bill.

**7.** *Accord, Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972).

**8.** The two most significant exceptions are found in subsections (a) and (h) of section 2680. Subsection (a) provides that the Government shall not be liable on the basis of

an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a) (1976). Under subsection (h), sovereign immunity is also retained for claims

arising out of assault, battery, false imprisonment, false arrest, malicious prosecution,

abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided,* That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

*Id.* § 2680(h). The other exceptions, more limited in application, generally relate to specified activities or agencies of the Government. Subsection (j), for example, excludes claims "arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war," *id.* 2680(j), and subsection (k) excludes claims "arising in a foreign country," *id.* § 2680(k).

stands in the shoes of a private person in like circumstances. The Government, however, is the Government, and it often wears shoes that only a sovereign wears. Thus, a difficult issue under the Act has fallen to the courts for resolution: under what circumstances is the United States liable for acts or omissions in the performance of functions for which there are no obvious private analogues?

## B. *The Rise of the* Feres *Doctrine*

Especially in cases involving military claimants, the Supreme Court has followed a wavering course in its interpretation of the Tort Claims Act's requirement of analogous private liability.[9] In *Brooks v. United States*, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949), the Court held that two servicemen could recover under the Act for injuries resulting from the negligent operation of a motor vehicle by an employee of the United States, when the accident did not occur incident to the claimants' military service. "It would be absurd to believe," said the Court, "that Congress did not have the servicemen in mind in 1946, when this statute was passed." *Id.* at 51, 69 S.Ct. at 919. The Court emphasized that Congress had expressly eschewed governmental liability for overseas and war activities of the Government, but had created no general exception for the claims of servicemen. *See id.*[10] The Court further declared that federal statutes providing disability and death benefits to members of the service "indicate no purpose to forbid tort actions under the Tort Claims Act," *id.* at 53, 69 S.Ct. at 920, for "[u]nlike the usual workman's compensation statute, . . . there is nothing in the Tort Claims Act or the veterans' laws which provides for exclusiveness of reme-

dy," *id.* The Court thus refused to call either remedy exclusive when Congress had not done so, although it did not foreclose an adjustment, based on any available disability or death benefits, to avoid a double recovery for the same injuries. *See id.* at 53–54, 69 S.Ct. at 920–921. Recognizing the possible implications of its decision,[11] the Court carefully limited the scope of its ruling:

> [W]e are dealing with an accident which had nothing to do with the Brooks' army careers, injuries not caused by their service except in the sense that all human events depend upon what has already transpired. Were the accident incident to the Brooks' service, a wholly different case would be presented.

*Id.* at 52, 69 S.Ct. at 920.

That "wholly different case" was *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). *See id.* at 138, 71 S.Ct. at 155. In *Feres*, the Court dealt with three separate actions brought by servicemen or their personal representatives: two involved claims of medical malpractice by military doctors, and the other suit charged that the injured serviceman had been quartered in unsafe barracks. *Id.* at 136–37, 71 S.Ct. at 154–55. The Court concluded that none of these claims stated a cause of action under the Tort Claims Act. Crucial to this decision was that "each claimant, while on active duty and not on furlough, sustained injury due to negligence of others in the armed forces." *Id.* at 138, 71 S.Ct. at 155.[12]

Emphasizing that the relationship between members of the United States armed forces and their government is "distinctly federal in character," *see id.* at 143, 71 S.Ct.

---

9. Cf. *New York Trust Co. v. Eisner*, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921) (Holmes, J.) ("Upon this point a page of history is worth a volume of logic.").

10. *See also* note 8 and accompanying text *supra.*

11. The Government envisioned "dire consequences" from the decision, including governmental liability for "[a] battle commander's poor judgment, an army surgeon's slip of hand,

[or] a defective jeep which causes injury." *Brooks v. United States*, 337 U.S. at 52, 69 S.Ct. at 920.

12. The Court thus distinguished *Brooks*, in which the claimants were "on furlough, driving along the highway, under compulsion of no orders or duty and on no military mission." *Feres v. United States*, 340 U.S. at 146, 71 S.Ct. at 159.

at 158, the Court found no private liability "even remotely analogous to that which [the claimants] are asserting against the United States," *id.* at 141, 71 S.Ct. at 157.

> We know of no American law which ever has permitted a soldier to recover for negligence, against either his superior officers or the Government he is serving. Nor is there any liability "under like circumstances," for no private individual has power to conscript or mobilize a private army with such authorities over persons as the Government vests in echelons of command.

*Id.* at 141–42, 71 S.Ct. at 157 (footnote omitted). The purpose of the Act, according to the Court, was "to waive immunity from recognized causes of action and was not to visit the Government with novel and unprecedented liabilities." *Id.* at 142, 71 S.Ct. at 157.

Furthermore, despite its reasoning in *Brooks*, the Court in *Feres* attached considerable significance to the "enactments by Congress which provide systems of simple, certain, and uniform compensation for injuries or death of those in armed services," *id.* at 144, 71 S.Ct. at 158.[13]

> If Congress had contemplated that this Tort Act would be held to apply in cases of this kind, it is difficult to see why it should have omitted any provision to adjust these two types of remedy to each other. The absence of any such adjustment is persuasive that there was no awareness that the Act might be interpreted to permit recovery for injuries incident to military service.

*Id.* Whereas the Court in *Brooks* had refused to find the military benefits remedy exclusive in the face of congressional silence, *see* 337 U.S. at 53, 69 S.Ct. at 920, the Court in *Feres* did exactly that for claims arising "incident to service."[14] *See also Hatzlachh Supply Co. v. United States,* 460 U.S. 444, 100 S.Ct. 647, 650, 62 L.Ed.2d 614 (1980) (per curiam) ("we understood Congress intended [the military benefits remedy] to be the sole remedy for service–connected injuries").

Building on its decision in *Feres,* the Court in *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), adhered to a strict reading of the Act's requirement of analogous private liability, concluding that the Government would not be liable to private parties for negligent firefighting by the Coast Guard. *See id.* at 43–44, 73 S.Ct. at 971–972. The tension between the reasoning of *Brooks* and that of *Feres,* coupled with *Dalehite*'s affirmance of the *Feres* approach, could have led one to believe that *Feres* had implicitly overruled *Brooks.* In *United States v. Brown,* 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954), however, the Court confirmed that *Brooks* had indeed survived *Feres.* In *Brown,* a discharged veteran claimed that he had received negligent medical treatment at a Veterans Administration hospital for an injury that he had sustained several years earlier while on active military duty. The Court held that he could recover under the Tort Claims Act for the exacerbation of his injury, even though the ill effects of the treatment had already increased his veteran's compensation. The Court redefined the rationale for its decision in *Feres*:

> The peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on disci-

---

**13.** *See, e. g.,* 10 U.S.C. § 1074 (1976) (medical and dental care for service personnel); *id.* §§ 1201–1221 (1976 & Supp. II 1978) (retirement or separation for physical disability); *id.* §§ 1475–1488 (1976) (death benefits); 38 U.S.C. §§ 301–362 (1976) (amended in part 1979) (compensation for service–connected disability or death); *id.* §§ 401–423 (1976 & Supp. II 1978) (amended in part 1979) (dependency and indemnity compensation for service–connected death); *id.* §§ 501–562 (1976 & Supp. II 1978) (pension for nonservice–connected disability or death); *id.* §§ 601–654 (1976 & Supp. II 1978) (amended in part 1979) (hospital and medical care for veterans).

**14.** Statutory compensation for disability or death generally is available regardless of whether the injury was "incident to service" within the meaning of the *Feres* doctrine. *See Parker v. United States,* 611 F.2d 1007, 1012 & n.6 (5th Cir. 1980). *See also United States v. Brown,* 348 U.S. 110, 114 & n.*, 75 S.Ct. 141, 144 & n.*, 99 L.Ed. 139 (1954) (Black, J., dissenting). *See generally* note 13 *supra.*

pline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty, led the Court to read that Act as excluding claims of that character.

*Id.* at 112, 75 S.Ct. at 143. Under this test, the Court found the *Feres* doctrine inapplicable to the case at hand, concluding that "unlike the claims in the *Feres* case, this one is not foreign to the broad pattern of liability which the United States undertook by the Tort Claims Act." *Id.* On the question of exclusivity of remedies, the Court reverted to its stance in *Brooks*:

> Congress could, of course, make the compensation system the exclusive remedy. . . . We noted in the *Brooks* case, 337 U.S. 49, 53, [69 S.Ct. 918, 920, 93 L.Ed. 1200,] that the usual workmen's compensation statute was in this respect different from those governing veterans, that Congress had given no indication that it made the right to compensation the veteran's exclusive remedy, that the receipt of disability payments under the Veterans Act was not an election of remedies and did not preclude recovery under the Tort Claims Act but only reduced the amount of any judgment under the latter Act. We adhere to that result.

*Id.* at 113, 75 S.Ct. at 143–44.[15]

### C. *A Retreat from the Reasoning of* Feres

After deciding the trilogy of *Brooks, Feres,* and *Brown,* the Supreme Court left to the lower federal courts the task of drawing the line between claims arising "incident to service," which would be barred by *Feres,* and other claims by mili-

tary personnel, for which recovery would be allowed under *Brooks* and *Brown. See, e. g., Hale v. United States,* 416 F.2d 355 (6th Cir. 1969); *Chambers v. United States,* 357 F.2d 224 (8th Cir. 1966).[16] Meanwhile, however, in other cases demanding an interpretation of the Tort Claims Act's requirement of analogous private liability, the Supreme Court retreated from the reasoning that had carried the day in *Feres* and *Dalehite.*[17] In *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), for example, the Court held that the Act allowed a recovery for the Coast Guard's negligent operation of a lighthouse. Although the four dissenters pointed out the Court's reasoning to the contrary in *Feres* and *Dalehite, see id.* at 70–76, 76 S.Ct. at 127–130 (Reed, J., joined by Burton, Clark, and Minton, JJ., dissenting), the majority concluded that the Act did not exclude "liability in the performance of activities which private persons do not perform," *id.* at 64, 76 S.Ct. at 124 (majority opinion). In *Rayonier, Inc. v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), the Court, despite the inconsistency with its previous ruling in *Dalehite,* held that the Government would be liable under the Act for negligent firefighting by the Forest Service. In language diametrically opposed to that in *Feres* and *Dalehite,* the Court stated that "the very purpose of the Tort Claims Act was to waive the Government's traditional all–encompassing immunity from tort actions and to establish novel and unprecedented governmental liability." *Id.* at 319, 77 S.Ct. at 377.

In *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963), the

---

**15.** Three justices dissented from the *Brown* decision, arguing that the claimant's injury was closely related to his military service and that his statutory compensation should be his exclusive remedy. *United States v. Brown,* 348 U.S. at 114, 75 S.Ct. at 144 (Black, J., joined by Reed and Minton, JJ., dissenting). "To permit a veteran to recover damages from the Government in circumstances under which a soldier on active duty cannot recover seems like an unjustifiable discrimination which the Act does not require." *Id.*

**16.** Most lower courts have applied the *Feres* doctrine with a vengeance, rejecting virtually all claims based on injuries suffered while on active–duty status. *See* Note, *Stencel Aero Engineering Corporation v. United States: An Expansion of the Feres Doctrine to Include Military Contractors, Subcontractors, and Suppliers,* 29 Hastings L.J. 1217, 1218–19 (1978).

**17.** *See generally* Note, *Defining the Government's Duty Under the Federal Tort Claims Act,* 33 Vand.L.Rev. 795, 797–801 (1980).

Court again limited its decision in *Feres*, holding that the *Feres* doctrine did not extend to claims by federal prisoners based on the negligence of prison officials. Although the Court found "no occasion to question *Feres*, so far as military claims are concerned," *id.* at 159, 83 S.Ct. at 1856, the Court did question the significance of an alternative statutory compensation scheme, *see id.* at 160, 83 S.Ct. at 1856, and rejected an argument that recovery should be barred to protect prison discipline, which the Government thought just as important as the military discipline protected in *Feres*, *see id.* at 159, 83 S.Ct. at 1856. The Court concluded its opinion with a statement that further undercut the *Feres* doctrine, a doctrine that—in light of the Court's evolving dilution of the requirement of analogous private liability—now appeared to be nothing more than a court–made exception to Tort Claims Act liability:[18] " 'There is no justification for this Court to read exemptions into the Act beyond those provided by Congress. If the Act is to be altered that is a function for the same body that adopted it.' " *Id.* at 166, 83 S.Ct. at 1859 (quoting *Rayonier, Inc. v. United States*, 352 U.S. at 320, 77 S.Ct. at 377).

### D. *The Reaffirmance of* Feres

The *Feres* doctrine, however, refused to die the quiet death that some had anticipated. In *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977),[19] the Supreme Court, without discussing its apparently inconsistent intervening decisions, broadly reaffirmed the *Feres* doctrine, using the same analytical approach that had been thought discredited by those decisions. *See Parker v. United States*, 611 F.2d 1007, 1011 (5th Cir. 1980) ("Some of the same factors that were dismissed in *Rayonier* and *Muniz* were dusted off and reasserted in *Stencel*."). The Court declared that the *Feres* doctrine was grounded on three considerations: first, the "distinctly federal" character of the soldier–sovereign relationship; second, the presence of the alternative statutory compensation scheme; and third, the adverse effects that tort liability and litigation might have on military discipline. *See* 431 U.S. at 671–72, 97 S.Ct. at 2057–2058. Of the first factor, the Court stated that it would make "no sense to permit the fortuity of the situs of the alleged negligence to affect the liability of the Government to a serviceman who sustains service–connected injuries." *Id.* at 672, 97 S.Ct. at 2058. Of the second, the Court explained: "A compensation scheme such as the Veterans' Benefits Act serves a dual purpose: it not only provides a swift, efficient remedy for the injured serviceman, but it also clothes the Government in the 'protective mantle of the Act's limitation–of–liability provisions.' " *Id.* at 673, 97 S.Ct. at 2058 (quoting *Cooper Stevedoring Co. v. Fritz Kopke, Inc.*, 417 U.S. 106, 115, 94 S.Ct. 2174, 2179, 40 L.Ed.2d 694 (1974)).[20] Finally, on the

---

**18.** *See* Note, *supra* note 16, at 1229 ("it was the *Feres* Court and not Congress which precluded service personnel from suing the government directly under the [Tort Claims Act] for injuries incident to service").

**19.** In *Stencel*, the Supreme Court decided that third–party civilians, found liable to service personnel for injuries sustained incident to the claimants' military service, are barred by the *Feres* doctrine from seeking indemnity from the United States under the Tort Claims Act. *See generally* Note, *supra* note 16.

**20.** Understandably, the Court did not cite the "limitation–of–liability provision" on which it relied, for there is no such provision in the Veterans' Benefits Act. It is the *Feres* doctrine itself that provides the limitation of liability. *See* Note, *supra* note 16, at 1229. In dissent,

Justice Marshall took the majority to task on this point:

> [T]he Veterans' Benefits Act does not even contain an explicit declaration that it is the exclusive remedy against the Government for a serviceman's injury. The comparable compensation program for civilian employees of the Government does contain such a limitation of liability. 5 U.S.C. § 8116(c). Yet we have held that the broad language of the exclusivity provision in the civilian compensation scheme does not affect [the rights of third parties] . . . . The Court fails to explain why the absence of an exclusivity provision in the Veterans' Benefits Act forecloses suits by third parties in cases involving injuries to military personnel when the existence of such a clause does not bar similar actions when the injured employee works

question of military discipline, the Court reiterated its fears of "second–guessing military orders" and having servicemen "testify in court as to each other's decisions and actions." *Id.* Given *Stencel*, the *Feres* doctrine clearly lives, although its theoretical bases remain subject to serious doubt.[21]

## IV. THE SWINE FLU ACT

■ As we turn from our discussion of the *Feres* doctrine to an analysis of the Swine Flu Act, we seem to be moving from the frying pan into the fire. Congress acted on the swine flu legislation with extraordinary speed, and the lawmakers expressed their intent with far from ideal clarity. Despite the absence of a clear legislative intent, however, the duty remains ours to determine the meaning of the statute, and we must seek out whatever guidance we can find to light the path of our interpretation.

### A. *The Impetus for the Legislation*

On March 25, 1976, in response to an occurrence of swine flu among Army recruits at Fort Dix, New Jersey, President Gerald R. Ford delivered a message to the Congress concerning "a serious potential public health threat this winter from [this] strain of virus known as swine influenza." 122 Cong.Rec. 8049 (1976) (message from the President).[22] President Ford called for the expeditious approval of special appropriations legislation "to insure the production of sufficient vaccine to inoculate every man, woman, and child in the United States" and asked "each and every American to make certain he or she receives the vaccine this fall." *Id.* The President stated his desire for this ambitious immunization program to be in full operation by the beginning of September and completed by the end of November. *Id.* Congress responded promptly and affirmatively to the President's request, and the appropriations measure became law on April 15. *See* Joint Resolution of April 15, 1976, Pub.L.No. 94–266, 90 Stat. 362.[23]

Thus began this massive gamble [24] in preventive medicine. By summer, however, the program had run aground. The four manufacturers of the vaccine [25] found their insurers unwilling to accept the risk of claims by persons alleging injury from the vaccination, and the manufacturers would not proceed without insurance protection. *See* 122 Cong.Rec. 26,008–09 (1976) (re-

---

for one of the Government's civilian agencies.
*Stencel Aero Engineering Corp. v. United States*, 431 U.S. at 675–76, 97 S.Ct. at 2060 (Marshall, J., joined by Brennan, J., dissenting) (footnote omitted).

**21.** *See, e. g., Veillette v. United States*, 615 F.2d 505 (9th Cir. 1980); *Parker v. United States*, 611 F.2d 1007 (5th Cir. 1980).

**22.** The President discussed the seriousness of the swine flu threat:
  One month ago this strain of influenza was discovered and isolated among Army recruits at Fort Dix, New Jersey. The appearance of this strain has caused concern within the medical community because this virus is very similar to the one that caused a widespread and very deadly flu epidemic late in 1918–19. Some Americans will recall that 548,000 people died in this country during that tragic period—and 20 million people worldwide. 122 Cong.Rec. 8049 (1976) (message from the President).

**23.** For further historical information concerning the swine flu threat and the inception of the immunization program, see 122 Cong.Rec. 26,-

806–07 (1976) (remarks of Rep. Rogers); Comptroller General of the United States, The Swine Flu Program: An Unprecedented Venture in Preventive Medicine, H.R.Doc. No. 77–115, 95th Cong., 1st Sess. 8–10 (1977) [hereinafter cited as Comptroller General's Report]; Boffey, *Anatomy of a Decision: How the Nation Declared War on Swine Flu*, Science, May 14, 1976, *reprinted in* 122 Cong.Rec. 15,728 (1976).

**24.** *See* Comptroller General's Report, *supra* note 23, at 8. In the light of infallible hindsight, the swine flu threat was a mere bluff, and the Government's gamble a loser. No swine flu outbreaks occurred, a number of persons suffered serious adverse reactions to the vaccine, and the Government is still paying for claims arising from the costly program. *See id.*

**25.** At the time of the swine flu inoculation program, only six companies in the United States were licensed to produce flu vaccine, and only four companies were actually producing. *See id.* at 4.

marks of Sen. Kennedy); *id.* at 26,796, 26,799–800, 26,808–09 (remarks of Rep. Rogers). *See also Flu Drives are All Set to Roll—If the People And Vaccine Show Up,* Wall St.J., Aug. 4, 1976, *reprinted in* 122 Cong.Rec. 26,629 (1976). It was not the fear of liability for manufacturer negligence that concerned the insurance companies; instead, it was the risk of strict products liability [26] and the anticipated cost of defending the many meritless suits that the companies believed would be filed. *See* 122 Cong.Rec. 26,796, 26,799–800, 26,808–09 (1976) (remarks of Rep. Rogers).

Extensive negotiations among the Department of Health, Education, and Welfare, the vaccine manufacturers, and the insurance companies led to several proposals for filling this insurance gap. *See* 122 Cong.Rec. 26,008 (1976) (remarks of Sen. Kennedy); *id.* at 26,799, 26,809–10 (remarks of Rep. Rogers). The first proposed solution called for the Government simply to indemnify the manufacturers for liability arising other than for the manufacturers' negligence. *See id.* at 26,799, 26,809 (remarks of Rep. Rogers). Under a second proposal, the Government would have reinsured the insurance companies if they provided the insurance that the manufacturers demanded. *See id.* at 26,809. These alternatives proved unacceptable to the insurance companies, however, *see id.* at 26,810, and so, on Thursday, August 5, 1976, Senator Kennedy introduced another proposal, one that all the affected parties had agreed on. *See id.* at 26,007 (introduction of S. 3735, 94th Cong., 2d Sess.). This proposal called for a scheme of substituted liability.

## B. The Consideration and Passage of the Legislation

Rushing to act on the Kennedy legislation before a scheduled ten–day recess, Congress did not give the proposal the close attention that typically accompanies a significant enactment. Indeed, the legislation whisked through both houses in a single day, on Tuesday, August, 10, 1976. First the Senate, and then the House, debated and passed the legislation, each chamber acting without the benefit of any meaningful committee examination of the particular proposal being considered. *See* 122 Cong.Rec. 26,625–40 (1976) (Senate); *id.* at 26,793–817 (House).[27] In fact, during the House debate, most of the congressmen did not even have copies of the legislation that was before them. *See id.* at 26,794, 26,795 (remarks of Rep. Dingell).[28]

Recognizing the haste with which Congress was acting,[29] even the proponents of

---

26. Two court decisions especially worried the manufacturers and their insurers: *Davis v. Wyeth Laboratories, Inc.,* 399 F.2d 121 (9th Cir. 1968), and *Reyes v. Wyeth Laboratories,* 498 F.2d 1264 (5th Cir. 1974). *See* 122 Cong.Rec. 26,808–09 (1976) (remarks of Rep. Rogers). *See generally* Restatement (Second) of Torts § 402A (1965).

27. The Senate Committee on Appropriations received and reported the legislation within the space of a few hours. *See* 122 Cong.Rec. 26,625, 26,626 (1976). The committee's one–page report expressed several reservations about the proposal and did not give a recommendation for passage. *See* S.Rep. No. 94–1147, 94th Cong., 2d Sess., *reprinted in* [1976] U.S.Code Cong. & Admin.News, p. 1987. *See also* 122 Cong.Rec. 26,631 (1976) (remarks of Sen. Magnuson). On the House side, a number of congressmen believed that the measure should have been considered by the House Committee on the Judiciary, but it was not. *See, e.g., id.,* at 26,795 (remarks of Rep. Moss and Rep. Dingell); *id.* at 26,802 (remarks of Rep. Hungate); *id.* at 26,804–05 (remarks of Rep. McDonald).

28. *See also* 122 Cong.Rec. 26,795 (remarks of Rep. Moss) ("I cannot say that it is badly drafted because I cannot get a copy of it. . . . This is the worst possible way of legislating . . . .").

29. Representative Dingell was thoroughly unimpressed with the scant attention that the proposal was receiving: "If this is responsibly considered legislation, then I am the Queen of the May." *Id.* at 26,795 (1976) (remarks of Rep. Dingell). *See also id.* (remarks of Rep. Ottinger) ("Mr. Speaker, I would like to associate myself with the remarks of the gentleman from Michigan, and especially the gentleman's reference to the Queen of the May, that was not a bad comparison."). *But cf. id.* (remarks of Rep. Eckhardt) ("I must say I agree with almost everything my colleagues from California and Michigan have said except that I do believe this is legislation and that Mr. Dingell is not the Queen of the May.").

the legislation admitted that it was "not a perfect product." *Id.* at 26,799 (remarks of Rep. Rogers). *See also id.* at 26,008 (remarks of Sen. Kennedy) ("the proposed legislation is not without certain technical and legal problems"). Nonetheless, Congress believed that the measure had to be passed immediately so that the swine flu program could go forward. As Representative Eckhardt put it, "The reason I [am supporting the legislation] is simply this: The insurance companies have held the American people hostage to force passage of some kind of legislation of this kind. This is the only way they will permit a program to move forward." *Id.* at 26,795 (remarks of Rep. Eckhardt).[30] On Thursday, August 12, exactly one week after the bill had been introduced in the Congress, President Ford signed the Swine Flu Act into law. *See* National Swine Flu Immunization Program of 1976, 12 Weekly Comp. of Pres. Doc. 1256 (Aug. 16, 1976).

### C. The Provisions of the Act

The Act authorized the Department of Health, Education, and Welfare to establish and coordinate the swine flu immunization program. *See* 42 U.S.C. § 247b(j)(1) (1976). The Department was to purchase the vaccine, *see id.* § 247b(j)(1)(A), (B), and provide it to state and federal health authorities, who would administer the vaccinations without charge to the recipients, *see id.* § 247b(j)(1)(C), (D), (k)(2)(B). Each person to be immunized was to receive a statement advising him of the risks and benefits of the vaccination and of his rights and remedies if an adverse reaction should occur. *See id.* § 247b(j)(1)(F), (k)(2)(B). Before receiving the vaccination, he would be asked to sign a form giving his consent to the procedure. *See id. See generally* 122 Cong.Rec. 26,808 (1976) (remarks of Rep. Rogers).

To address the vaccine manufacturers' and their insurers' twin concerns of strict products liability and the defense of meritless suits, the Act took a unique approach to the problem of liability. *See generally* 42 U.S.C. § 247b(k)(1) (1976) (congressional statement of purpose). "Program participants," as defined in the Act, *see* 42 U.S.C. § 247b(k)(2)(B) (1976), became protected parties who would bear only a limited degree of liability. Because those who would be administering the vaccinations had also begun to encounter difficulties in maintaining insurance coverage, the protected program participants would include both the vaccine manufacturers and the persons and organizations that would actually be giving the inoculations. *See* 122 Cong.Rec. 26,800, 26,808 (1976) (remarks of Rep. Rogers).[31]

Representative Hungate commented: "I think we are going into a lot of this on faith, more faith than I have. When it comes to placebos, I think this is a political placebo." *Id.* at 26,802 (remarks of Rep. Hungate). A number of other congressmen expressed similar sentiments. *See, e.g., id.* at 26,795 (remarks of Rep. Flowers and Rep. Moss); *id.* at 26,802 (remarks of Rep. Krueger).

**30.** Representative Frenzel agreed: "This bill makes me a little nervous. . . . But, we really have no choice." *Id.* at 26,805 (remarks of Rep. Frenzel). *Cf. id.* at 26,803 (remarks of Rep. Carter) ("What I am interested in is helping the American people and saving them from swine flu this year. . . . I am not skilled in the legal aspects of this legislation. I will leave that to the excellent attorneys—and I think more of them than Shakespeare did . . . .").

Representative Fisher later explained why "the legislation was passed under an extraordinary legislative procedure," *id.* at 27,246 (extended remarks of Rep. Fisher).

There is far from unanimous agreement in the Congress on the details of the new legislation—or, indeed, on the desirability of having the Federal government fill the insurance coverage gap. Most of us in the Congress concluded, however, that we had to act fast and affirmatively to make sure that the program we had earlier approved would not collapse. That explains the strong vote of support in both the House and the Senate. *Id.* at 27,246–47.

**31.** Accordingly, the Act defined "program participant," as to any particular claim, to mean

the manufacturer or distributor of the swine flu vaccine used in an inoculation under the swine flu program, the public or private agency or organization that provided an inoculation under the swine flu program without charge for such vaccine or its administration and in compliance with the informed consent form and procedures requirements prescribed pursuant to subparagraph (F) of paragraph (1) of this subsection, and the

A claim that would otherwise have been available against a program participant instead would be brought against the United States, under the procedures of the Tort Claims Act, with the United States substituting for the program participant as the party defendant. *See id.* § 247b(k)(2)(A). The United States thus would be liable

for personal injury or death arising out of . . . the swine flu program and based upon the act or omission of a program participant . . . on any theory of liability that would govern an action against such program participant under the law of the place where the act or omission occurred, including negligence, strict liability in tort, and breach of warranty.

*Id.* § 247b(k)(2)(A)(i). *See also id.* § 247b(*1*)(1). This remedy would preclude a direct action against a program participant, *see id.* § 247b(k)(3), and any action erroneously brought against such a person would be defended by the United States and treated as an action against the Government, *see id.* § 247b(k)(4), (5). A program participant would lose its protection under the Act and become subject to direct liability, however, if it failed to cooperate with the Government in the defense of a claim based upon its act or omission. *See id.* § 247b(k)(6). In any event, the United States retained a right to indemnification from the program participant, recoverable in a separate ac-

tion, for damages paid and costs incurred in defending a claim to the extent that the claim arose from the program participant's negligence or from its failure to comply with its contractual obligations to the United States. *See id.* § 247b(k)(7).[32]

Through this unusual remedial scheme, the Government would provide the insurance coverage that the vaccine manufacturers had been denied in the private sector[33] and would remove both of the major fears concerning liability that had led to the enactment. First, because all actions would initially be brought against the United States, the burden would fall on the Government to litigate and weed out meritless claims; only if a claimant could recover in his action against the Government would the vaccine manufacturer be subject to a possible claim for indemnification. *See* 122 Cong.Rec. 26,796, 26,799–800 (1976) (remarks of Rep. Rogers). Second, because the right to indemnification generally would be limited to claims based on negligence, the vaccine manufacturers would not even bear the risk of ultimate financial responsibility for claims based on strict products liability. *See id.* at 26,808–09.[34]

### D. *The Implementation of the Act*

The inoculation program was implemented under the terms of the Swine Flu Act, and some forty–five million Americans received vaccinations. *See* Comptroller Gen-

---

medical and other health personnel who provided or assisted in providing an inoculation under the swine flu program without charge for such vaccine or its administration and in compliance with such informed consent form and procedures requirements.

42 U.S.C. § 247b(k)(2)(B) (1976).

**32.** Confusion reigned in the House of Representatives when it was discussing this indemnification provision, with some members insisting that the United States would have a right to indemnity for certain claims based on strict liability, under the "contractual obligations" prong of this provision. *See* 122 Cong.Rec. 26,801–03 (remarks of Rep. Rogers, Rep. Krebs, Rep. Waxman, Rep. Mann, Rep. Seiberling, Rep. Eckhardt, Rep. Maguire, Rep. Brown, and Rep. Dingell). As our discussion in the text suggests, however, the language and purpose of the Act make clear that the right to indemnification generally was to be limited to

cases in which the program participant had been negligent.

**33.** *See, e.g.,* 122 Cong.Rec. 26,628 (remarks of Sen. Taft) (the Government is to "act as an insurer in this national program" and provide "Government liability insurance"); *id.* at 26,-804 (remarks of Rep. Paul) (the Act will provide an "insurance policy"); *id.* at 26,246 (extended remarks of Rep. Fisher) (the Act authorizes "the Federal government to fill the liability insurance gap on an emergency basis").

**34.** The private insurance industry was willing "to provide the necessary insurance for program participants' residual liability, given that the meritless suits are handled by the Federal Government and that the liability is limited by the legislation." *Id.* at 26,811 (remarks of Rep. Rogers).

eral of the United States, The Swine Flu Program: An Unprecedented Venture in Preventive Medicine, H.R.Doc. No. 77–115, 95th Cong., 1st Sess. 55 (1977). Although the threat of swine flu did not materialize, the vaccinations themselves caused a number of adverse side effects. *See id.* at 8. Moreover, the predictions of the insurance industry concerning litigation and liability proved regrettably accurate, and recoveries from the United States under the Swine Flu Act may run well into the millions of dollars. *See id.* at 17.[35]

## V. THE APPLICABILITY OF *FERES* TO SWINE FLU CLAIMS

Having outlined the basic features of the *Feres* doctrine and the Swine Flu Act, we turn now to the intriguing question of whether the *Feres* doctrine should apply to swine flu claims asserted by members of the military. In particular, we must address the appellants' argument that even if *Feres* does bar recoveries under the Swine Flu Act for tortious acts or omissions by fellow members of the armed forces,[36] it should not bar claims based on the tortious conduct of a private manufacturer of the swine flu vaccine. Finding little direct guidance in the legislative history of the Swine Flu Act, our analysis focuses on the basic scheme and overall intent of the Act and on the underlying purposes of the *Feres* doctrine. We conclude that *Feres* is inapplicable to swine flu claims based on acts or omissions of private program participants and that the appellants should be allowed to pursue their claims for relief.

### A. *The Military Prong of the Immunization Program*

In enacting the Swine Flu Act, Congress plainly contemplated that the immunization program would extend to members of the military. The initial impetus for the program, after all, was an occurrence of swine flu among military recruits at Fort Dix, New Jersey, and its fundamental purpose was to give each and every American the opportunity to be immunized. *See* page 589 *supra.* Under the Act, the Department of Health, Education, and Welfare was to provide appropriate quantities of the vaccine to health authorities within the Department of Defense. *See* 42 U.S.C. § 247b(j)(1)(D) (1976); 122 Cong.Rec. 26,812 (1976) (remarks of Rep. Rogers). The Department of Defense would then be responsible for actually inoculating members of the armed forces. *See id.*

Although Congress thus expected and intended that the military services would participate in the inoculations, it apparently was quite willing to give the military a free hand in implementing its prong of the immunization program. For one thing, Congress anticipated that members of the service would receive a stronger vaccine than would civilians, and that the added strength of the vaccine might lead to an increased number of minor side effects:

The military services—as is their custom—plan to use a more potent and more broadly constituted vaccine than will be used in the civilian program. Whereas most civilians will receive a small vaccine dose targeted solely against swine flu, the military services will administer a much larger dose with twice the civilian dose targeted at swine flu and the remainder against two other flu strains. The primary purpose of the military immunization program is to conserve the nation's fighting force rather than to protect individuals, so the military puts greater emphasis on making certain that the vaccine is strong enough to provide protection. It is less concerned about possible side effects, unless those side effects threaten to disable the fighting force.

As one top military medical man put it, "Generally speaking, it's not at all intolerable for recruits to have a bad evening . . . They are febrile. They do feel lousy . . . A significant number of them are losing their meals as they come out of the mess. But they're back at work the next morning." (And they

---

**35.** *See also note 24 supra.*

**36.** *See note 42 infra.*

don't often file malpractice suits.) Because so much of the military population falls into the 18–to–24 age group that responded only to the "whole virus" type vaccines, the military will use only those in its program. One of the military's chosen vaccines caused temperatures of 100°F or more in 20 percent of the recipients and systemic reactions (headache, nausea, fever, and the like) in 31 percent.

122 Cong.Rec. 26,812 (1976) (remarks of Rep. Rogers). Moreover, the requirement of obtaining the informed consent of each person to be inoculated, see page 589 supra, a requirement considered an indispensable "pillar" of the swine flu immunization program generally, see 122 Cong.Rec. 26,628 (1976) (remarks of Sen. Javits),[37] apparently was not so indispensable in the case of military inoculations. During the Senate debate on the Swine Flu Act, Senators Javits and Allen engaged in a colloquy on this subject:

> Mr. Javits. . . . I do have a somewhat special problem, which staff has called to my attention, as the Senator will immediately recognize, with the Armed Forces. I cannot foretell how the United States will handle that.
>
> Mr. Allen. That brings on a little more talk, then. The Senator will concede that in some respects it is not going to be voluntary; is that correct?
>
> Mr. Javits. No, I cannot say that. I just do not know how the Armed Forces would handle the question. . . .
>
> But I would like to add to what I have said that as Congress passes this legislation, it is in the spirit that for every American it is entirely voluntary. As to the nonmilitary forces, the law itself, in specific terms, makes that very clear
> . . . .

> Mr. Allen. In other words, the program will be available to the citizens, and, with the possible exception of a mandatory program as far as the armed services are concerned, he gives assurance that this is purely voluntary?
>
> Mr. Javits. I do.

Id. at 26,636 (remarks of Sen. Javits and Sen. Allen).[38]

## B. The Absence of Direct Legislative Guidance

Nowhere in the legislative history of the Swine Flu Act is a discussion of whether Congress intended the Feres doctrine to bar swine flu claims by members of the armed forces. To be sure, Representative Rogers, as an aside to his discussion of the possible side effects of the stronger military vaccine, did note that military personnel "don't often file malpractice suits," id. at 26,812 (remarks of Rep. Rogers), but this offhand comment is hardly the light at the end of our tunnel. On the one hand, the remark might suggest that Feres should not preclude swine flu claims, for the statement implies that some military claims, albeit few, might be filed. On the other hand, of course, military personnel would not often file claims if the claims were barred by Feres. Our search for an explicit legislative directive concerning Feres thus leaves us groping in the dark, and so we must look elsewhere for a solution to the Feres question.

The Government would have us focus on section 247b(k)(5)(C) of the Act, which addresses the relationship between the Act and other remedies against the United States, but that provision takes us nowhere. Section 247b(k)(5)(C) provides:

---

**37.** The Senate debate on the Swine Flu Act emphasized the importance of the informed consent procedure. See, e. g., 122 Cong.Rec. 26,626–27, 26,628, 26,634, 26,635–36 (1976) (remarks of Sen. Javits); id. at 26,631 (remarks of Sen. Beall); id. at 26,639 (remarks of Sen. Hathaway).

**38.** The unadorned language of the Act suggests that the informed consent procedure was not to be limited to civilian inoculations, but instead was to be followed for all inoculations, includ-

ing those of military personnel. See 42 U.S.C. § 247b(j)(1)(F) (1976) ("informed consent form and procedures for assuring that the risks and benefits from the swine flu vaccine are fully explained to each individual to whom such vaccine is to be administered") (emphasis added). See also id. § 247b(k)(2)(B). As to the relevance of military noncompliance with the informed consent procedure, see notes 42 and 44 infra.

Where an action or proceeding under [the Swine Flu Act] is precluded because of the availability of a remedy through proceedings for compensation or other benefits from the United States as provided by any other law, the action or proceeding shall be dismissed, but in that event the running of any limitation of time for commencing, or filing an application or claim in, such proceedings for compensation or other benefits shall be deemed to have been suspended during the pendency of the civil action or proceeding under [the Swine Flu Act].

42 U.S.C. § 247b(k)(5)(C) (1976). The Government maintains that this provision precludes swine flu actions by military claimants because of the "enactments by Congress which provide systems of simple, certain, and uniform compensation for injuries or death of those in armed forces," *Feres v. United States*, 340 U.S. at 144, 71 S.Ct. at 158. Indeed, argues the Government, appellant Hollar already is receiving disability benefits. *See* page 583 *supra*.

■ The Government's position is sleeveless. Section 247b(k)(5)(C) does not itself bar an action under the Swine Flu Act; another remedy must preclude it. Here, the appellants' actions are barred by the presence of the alternative military compensation scheme, and section 247b(k)(5)(C) is therefore applicable, only if the *Feres* doctrine makes it so, for the alternative compensation scheme is not made exclusive by its own terms.[39] The alternative scheme thus is exclusive only if the *Feres* doctrine applies, and section 247b(k)(5)(C) provides no guidance on this score.[40]

---

**39.** *See* note 20 *supra*.

**40.** The language of § 247b(k)(5)(C) does suggest that Congress anticipated that some swine flu claims would be precluded by the presence of *other, exclusive statutory remedies against* the United States. Our conclusion that the alternative military compensation scheme is not exclusive in the present case, however, does not render § 247b(k)(5)(C) superfluous. The *Feres* doctrine does preclude swine flu recoveries, and therefore does make the alternative military compensation system exclusive, for claims based on acts or omissions of fellow

---

C. *The General Purpose and Structure of the Act*

Finding no specific answer in the language of the Act or in its legislative history, we must look to the general purpose and structure of the Act to determine whether the *Feres* doctrine should apply. The Act responded to the inability of the vaccine manufacturers and other program participants to obtain adequate liability insurance, the inability resulting primarily from the fear of strict products liability and of having to defend numerous meritless suits. *See* pages 589–590 *supra*. To fill this insurance gap, the United States agreed, in effect, to itself become an insurer of the program participants, providing this unique insurance protection by subjecting itself to direct suit based on acts or omissions of the program participants. *See* pages 591–592 *supra*.

■ That the United States was to serve as a substitute defendant, however, was not intended to vary the substantive rights of the claimants to recover, whether in negligence or strict liability, for the tortious conduct of the program participants. As Representative Rogers remarked, "no one's rights are limited by the substitution of the United States as the party defendant." 122 Cong.Rec. 26,810 (1976) (remarks of Rep. Rogers). The Act "merely establishes a new procedure for vindicating such claims as the claimants could have made under the terms of their own State law against ... program participants." *Id.* at 26,814. Thus, the substitution was exactly that, with the United States assuming—subject to a possible right to indemnification later

---

members of the service. *See* note 42 *infra*. Moreover, § 247b(k)(5)(C) may have application outside the military context. For example, a federal civilian employee, having received a swine flu vaccination incident to his employment, could not assert a claim under the Swine Flu Act alleging that his fellow federal employee had negligently administered the inoculation; the injured employee's exclusive remedy would be his entitlement to statutory compensation. *See Mohr v. United States*, 184 F.Supp. 80 (N.D.Cal.1960); 5 U.S.C. § 8116(c) (1976).

on—a liability identical to that which otherwise would have attached to the program participants themselves. *See also id.* at 26,-637–39 (remarks of Sen. Hathaway) (arguing that the Act would go too far in restructuring normal litigation patterns).

### D. The Use of the Procedures of the Tort Claims Act

■ Not surprisingly, Congress selected the framework of the Tort Claims Act to govern the procedure for asserting claims against the United States under the Swine Flu Act. In the Tort Claims Act, Congress found a comprehensive procedural system, with provisions addressing such matters as the exhaustion of administrative relief and the amount of fees that may be received by a claimant's attorney. *See id.* at 26,811 (remarks of Rep. Rogers). *See generally* pages 583–584 *supra.*[41] In utilizing the established procedures of the Tort Claims Act, however, Congress did not intend to affect the very different rules of substantive law that were to be applied for Swine Flu Act claims.

These claims are to be made using the well–known, established procedures of

the Federal Tort Claims Act, . . . but are to be governed by the substance of the law of the place in which the claim accrues so that no one's rights are limited by the substitution of the United States as the party defendant.

122 Cong.Rec. 26,810 (1976) (remarks of Rep. Rogers).

### E. The Policies of Feres and Their Application to Swine Flu Claims

■ The appellants in the cases now before us do not contend that Swine Flu Act recoveries should be available for tortious acts or omissions by fellow members of the armed forces.[42] What they do argue is that their military status should not preclude their recovery under the Act for a vaccine manufacturer's tortious conduct, conduct that, absent the Act, would give rise to a claim assertable directly against the manufacturer.[43] Unless *Feres* bars their claims, the appellants are entitled to a recovery from the United States, in its role as a surrogate defendant, if they can prove that, absent the Act, the manufacturer would be liable in tort under local law. *See* 42 U.S.C. § 247b(k)(2)(A) (1976).[44]

---

41. As Representative Rogers noted, the Tort Claims Act approach would utilize "the normal mechanism for settling claims in tort against the United States, with claims agents and U.S. attorneys already in place across the country. In short, it can be done in time for this program." 122 Cong.Rec. 26,800 (1976) (remarks of Rep. Rogers).

42. Such a contention would surely fail, for it would run headlong into the *Feres* doctrine. Under the Swine Flu Act, federal employees have a protected status similar to that of private program participants. *See* 42 U.S.C. § 247b(k)(3) (1976). To the extent that federal employees are within the Act's definition of "program participants," *see id.* § 247b(k)(2)(B), the liability of the United States based on their acts or omissions is identical to that based on acts or omissions of private program participants. *See id.* § 247b(k)(2)(A). To the extent that employees who were involved in the program fall outside this definition, they retain their protected status for activities or decision-making concerning the program, *see id.* § 247b(k)(3), but the United States is liable for their conduct only to the extent that the Tort Claims Act itself so provides, *see* 122 Cong. Rec. 26,814 (1976) (remarks of Rep. Rogers). In either case, the liability of the United States

for acts or omissions of its employees is at least substantially similar (and identical in the case of employees who are not program participants) to its basic liability under the Tort Claims Act. Thus, if the alleged tort were committed by a fellow member of the military service, the *Feres* doctrine and the policies it represents would apply with no less force here than in other cases arising under the Tort Claims Act, and the doctrine would bar recovery against the Government for injuries incurred incident to service.

43. The Government does not dispute that the *Feres* doctrine would be inapplicable to claims asserted directly against the vaccine manufacturer. *See Nikiforow v. Rittenhouse*, 277 F.Supp. 608, 612–13 (E.D.Pa.1967). *See also Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977).

44. The appellants may be able to show, for example, that the vaccine manufacturer produced a defective vaccine that would render it liable under local law on a theory of strict products liability. *See generally* Restatement (Second) of Torts § 402A (1965):

(1) One who sells any product in a defective condition unreasonably dangerous to the user

Because of the unique liability scheme of the Swine Flu Act, the *Feres* doctrine is not directly applicable. Nonetheless, we must examine the policies on which the doctrine rests to determine whether its application would be appropriate when the United States is a substitute defendant under the Swine Flu Act. As recapitulated in *Stencel Aero Engineering Corp. v. United States*,[45] the doctrine is predicated on the "distinctly federal" relationship between the United States and its service personnel, on the presence of an alternative military compensation system, and on the fear of intruding on military discipline. *See* 431 U.S. at 671–72, 97 S.Ct. at 2057–2058. Given the Swine Flu Act's scheme of governmental liability, in the nature of insurance protection, for the acts or omissions of private parties, we do not believe that the rationale for the *Feres* doctrine supports its application here.

The first factor, the notion that the soldier–sovereign relationship is "distinctly federal in character," evades easy application. The Supreme Court has never made clear why this relationship makes impossible the determination of an analogous private liability, given that such a determina-

tion has been made in cases involving other relationships that are seemingly just as "distinctly federal in character." *See, e. g., United States v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963) (relationship between federal prison officials and prisoners); *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (relationship between Coast Guard and vessels it protects). *See generally* pages 587–588 *supra.* Whatever the scope of this consideration, however, it is clear that the relationship between a private participant in the swine flu program and a member of the armed forces is not "distinctly federal in character," and it is that relationship that is implicated when the United States has agreed to stand in the shoes of such a private party and take on the defense of its torts. Absent the Swine Flu Act, a member of the military would bring his action directly against the private party whose tortious conduct caused him injury,[46] and the substitution of the United States as the party defendant—in providing a form of insurance protection—does not alter the basically private nature of the claim for relief.[47] There is no diffi-

or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

　(a) the seller is engaged in the business of selling such a product, and

　(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

　(a) the seller has exercised all possible care in the preparation and sale of his product, and

　(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

On the other hand, the appellants may not rely on the decision of the military to administer a stronger–than–usual dose, *see* pages 593–594, *supra*, nor may they urge liability for the failure of the military to comply with the informed consent procedure, *see* page 594, *supra. See generally* note 42 *supra.* The military's failure to adhere to the informed consent procedure, of course, does not remove the vaccine manufacturer from the protected status of a program participant, *see* 42 U.S.C. § 247b(k)(2)(B) (1976), for whose conduct the

United States agreed to accept liability as a surrogate defendant. *See Wolfe v. Merrill Nat'l Laboratories, Inc.*, 433 F.Supp. 231, 235–36 (M.D.Tenn.1977).

**45.** Congress enacted the Swine Flu Act in 1976, before the Supreme Court's 1977 decision in *Stencel.* The vitality of the *Feres* doctrine thus was much less settled at the time of the enactment than it is today. *See generally* pages 587–588 *supra.*

**46.** *See* note 43 *supra.*

**47.** The Supreme Court's decision in *Stencel* does not suggest a contrary result. Although the Court did find the relationship between the United States and its military suppliers to be "distinctly federal in character," *see* 431 U.S. at 672, 97 S.Ct. at 2058, such a relationship is wholly distinct from the pertinent relationship in the present case, that of an individual member of the armed forces to a private supplier or other private participant in a government–sponsored program. Moreover, of course, the Swine Flu Act removes the basic problem of determining an analogous private liability by defining the Government's liability to be equivalent to a stated, existing private liability, that

culty in delineating an analogous private liability, for the Government's liability in defending swine flu claims is exactly the same as the liability that would otherwise attach to the private program participant. *See* pages 592, 595–596 *supra*.

The second factor discussed in *Feres*, the presence of an alternative military compensation system, is no less nebulous than the first. The Supreme Court has relied on this factor in cases in which it has applied the *Feres* doctrine, *see Stencel Aero Engineering Corp. v. United States*, 431 U.S. at 672–73, 97 S.Ct. at 2058; *Feres v. United States*, 340 U.S. at 144, 71 S.Ct. at 158, but it has also rejected the factor's importance in other cases in which its use would seem equally appropriate, *see United States v. Brown*, 348 U.S. at 113, 75 S.Ct. at 143, *Brooks v. United States*, 337 U.S. at 53, 69 S.Ct. at 920. *See generally* pages 584–587, 588–589 *supra*. To be sure, the presence of an alternative system of compensation makes a bar to recovery more tolerable, for the claimant will still receive some recompense for his injuries. Nonetheless, given the Supreme Court's inconsistent treatment of this factor, it cannot be said that the presence of an alternative compensation system either explains or justifies the *Feres* doctrine; it only makes the effect of the doctrine more palatable. *See Parker v. United States*, 611 F.2d 1007, 1011 (5th Cir. 1980) (the alternative compensation system "is one of the considerations discussed most inconsistently by the Supreme Court"); *Healy v. United States*, 192 F.Supp. 325, 328 n.13 (S.D.N.Y.) ("the presence or absence of a compensation system is by no means con-

trolling"), *aff'd*, 295 F.2d 958 (2d Cir. 1961). *See also Henninger v. United States*, 473 F.2d 814, 816 n.2 (9th Cir.), *cert. denied*, 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973).[48]

■ Whatever the merit of finding the alternative compensation system exclusive in the case of certain injuries that would otherwise be compensable under the basic Tort Claims Act, however, it should not be deemed exclusive in the context of the special governmental insurance plan created by the Swine Flu Act. When Congress originally enacted the Tort Claims Act, it waived the sovereign immunity of the United States and agreed that the United States, just as a private employer, would respond in tort for certain acts of its employees. *See* pages 583–584 *supra*. According to the Supreme Court, however, this waiver did not apply to cases falling within the *Feres* doctrine, in part because the alternative military compensation system sufficed "as a substitute for tort liability," *Stencel Aero Engineering Corp. v. United States*, 431 U.S. at 671, 97 S.Ct. at 2058. In the Swine Flu Act, on the other hand, we find the United States agreeing to bear what would otherwise be the private liability of a party not directly associated with the federal government and for whose acts the Government would not ordinarily be liable even absent sovereign immunity. Even if the alternative military compensation system can be thought of as a substitute for the Government's basic Tort Claims Act liability,[49] that system simply cannot be considered a substitute for the private liability of a swine flu program participant,

---

which would otherwise adhere to the program participant itself. *See* text.

**48.** *See generally* Note, *From* Feres *to* Stencel: *Should Military Personnel Have Access to FTCA Recovery?*, 77 Mich.L.Rev. 1099, 1104–09 (1979); Note, *supra* note 16, at 1226–29.

**49.** In *Stencel*, the Supreme Court found that the military compensation scheme not only limits the liability of the United States directly to a member of the armed forces for an injury sustained incident to his service, but also that the scheme precludes further liability under the Tort Claims Act to a private defendant seeking

indemnity from the United States for its liability to a military claimant for such an injury. *See* 431 U.S. at 673, 97 S.Ct. at 2058. *See also* note 19 *supra*. The Court thus found the Government's liability under the alternative scheme to be exclusive of any liability under the Tort Claims Act for acts or omissions of military personnel. We do not find this ruling inconsistent with our conclusion that the alternative scheme does not preempt the essentially private liability that the United States has assumed under the Swine Flu Act.

even though the United States may stand in its stead as the party defendant.[50]

At bottom, it is the third factor articulated by the Supreme Court, the protection of military discipline, that serves largely if not exclusively as the predicate for the *Feres* doctrine. Although the Court has woven a tangled web in its discussion of the "distinctly federal" notion and of the alternative compensation system, it has not wavered on the importance of maintaining discipline within the armed forces. The Court has found it unseemly to have military personnel, injured incident to their service, asserting claims that question the propriety of decisions or conduct by fellow members of the military. *See Stencel Aero Engineering Corp. v. United States,* 431 U.S. at 673, 97 S.Ct. at 2058; *United States v. Brown,* 348 U.S. at 112, 75 S.Ct. at 143. Only this factor can truly explain the *Feres* doctrine and the crucial line that it draws on the basis of whether an injury arose "incident to service." *See United States v. Muniz,* 374 U.S. 150, 162, 83 S.Ct. 1850, 1857, 10 L.Ed.2d 805 (1963); *United States v. Brown,* 348 U.S. at 112, 75 S.Ct. at 143. *See also Stencel Aero Engineering Corp. v. United States,* 431 U.S. at 676, 97 S.Ct. at 2060 (Marshall, J., joined by Brennan, J., dissenting).[51]

Governmental liability under the Swine Flu Act for acts or omissions of a private program participant no more implicates military discipline than would any other liability based on the conduct of a private party. The mere fact that the United States has taken the role of a surrogate defendant does not change the basic character of the litigation, litigation that focuses on the conduct of the private program participant, not that of a member of the military. We cannot imagine how this type of litigation could impinge on any legitimate interest in maintaining discipline within our fighting forces.

## VI. CONCLUSION

Having completed our arduous journey through the Tort Claims Act, the *Feres* doctrine, and the Swine Flu Act, we conclude that the *Feres* doctrine and its rationale have no application to claims under the Swine Flu Act based on acts or omissions of private program participants. We feel confident that this result serves the goal of achieving a "workable, consistent and equitable whole" in the scheme of statutory remedies against the United States, *see Feres v. United States,* 340 U.S. at 139, 71 S.Ct. at 156, and in a case such as this, with

**50.** Likewise, benefits under the alternative military compensation system will not necessarily mean a pro tanto reduction of a claimant's recovery under the Swine Flu Act. Although the Supreme Court has mandated such a reduction when it has allowed military personnel to recover under the basic Tort Claims Act, *see United States v. Brown,* 348 U.S. at 113, 75 S.Ct. at 143; *see also Brooks v. United States,* 337 U.S. at 53–54, 69 S.Ct. at 920–921, that result would be fundamentally inconsistent with the very different scheme of liability created by the Swine Flu Act. Under the Swine Flu Act, the United States responds in damages on the basis of what would otherwise be the liability of the program participants. Although Congress substituted the United States as the party defendant, it intended that the claimant recover exactly as he would if he were permitted to sue the program participant directly. *See* pages 595–596 *supra.* Whether the receipt of military benefits would reduce the liability of the program participant, and whether it thus reduces the liability of the United States under the Swine Flu Act, is a question of local law. *See generally* Restatement (Second) of Torts

§ 920A (1979) (collateral sources rule). *But cf. Overton v. United States,* 619 F.2d 1299 (8th Cir. 1980) (concluding, under typical Tort Claims Act analysis, that amounts received as Medicare benefits would reduce a claimant's recovery under the Swine Flu Act).

**51.** That *Feres* is primarily grounded on the protection of military discipline does not necessarily mean that the doctrine should be applied through case–by–case adjudications based on the effect that particular claims might have on this discipline. Our discussion of this matter here, of course, is in the context of an entirely different inquiry: whether, as a general question of law, the *Feres* doctrine should be extended to claims under the Swine Flu Act based on acts or omissions of private program participants. *Cf. Parker v. United States,* 611 F.2d 1007, 1013 (5th Cir. 1980) ("this factor is more relevant to the decision whether to imply an exception than it is to the exception's application"). *See also Torres v. United States,* 621 F.2d 30, 32 (1st Cir. 1980).

the issues twisted by inconsistent precedent and clouded by hazy congressional action, that is all we can hope for. The district court's denials of the claims of each appellant are reversed, and the causes remanded for further proceedings consistent with this opinion.

*It is so ordered.*