In re SWINE FLU IMMUNIZATION PRODUCTS LIABILITY LITIGATION.

Joseph LIMA, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 80–F–16.

United States District Court, D. Colorado.

Feb. 24, 1981.

---

Jack Kintzele, Denver, Colo., appearing on behalf of plaintiff.

Jeffrey Axelrad, Director, Torts Branch, Civil Division, U. S. Dept. of Justice, Washington, D. C., W. Russell Welsh, Trial Atty., Torts Branch, Civil Division, U. S. Dept. of Justice, Washington, D. C., William C. Danks, and Kathryn Richman, Asst. U. S. Attys., Denver, Colo., appearing on behalf of defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

SHERMAN G. FINESILVER, District Judge.

This case [1] brings into sharp focus various medical viewpoints and theories as to the causation and etiology of Guillain-Barre syndrome ("GBS"),[2] a neurologic disorder. Specifically, it involves the question whether the swine flu vaccine caused plaintiff, Joseph Lima, a thirty-three year old Denver microbiologist, to contract GBS during the winter of 1976–1977. The vaccination was administered pursuant to the mass immunization program of 1976 which sought to prevent a projected swine flu epidemic.

1. The case is brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et seq., in conjunction with the National Influenza Immunization Program of 1976 ("Swine Flu Act"), Public Law 94–380 (Aug. 12, 1976), 42 U.S.C. § 247b(j)–(1). The Swine Flu Act makes recovery from the United States the exclusive remedy for damages resulting from an inoculation. It further establishes the FTCA as the vehicle for asserting such claims. For the history of the Swine Flu Act and the litigation it has generated, see, Hunt v. United States, 636 F.2d 580, and Hollar v. United States, # 79–1282, 636 F.2d 580 (D.C.Cir.

1980); Sparks v. Wyeth Laboratories, 431 F.Supp. 411 (W.D.Okl.1977), aff'd per curiam, # 77–1407 (10th Cir. Dec. 22, 1978) (unpublished opinion); Alvarez v. United States, 495 F.Supp. 1188 (D.Colo. July 31, 1980).

2. GBS is discussed in greater detail below. Several cases have addressed the issue of causation between the swine flu vaccine and GBS. See, e. g., Alvarez, supra; Thompson v. United States, No. 79–1017 (E.D.Va. Nov. 6, 1980); Schultz v. United States, No. 78-0259 (S.D.Cal. Oct. 17, 1980).

## I

The lawsuit was filed on January 7, 1980. On February 21, 1980, it was transferred by the Judicial Panel on Multidistrict Litigation to the United States District Court for the District of Columbia for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. Thereafter, it was remanded back to this Court for further pretrial proceedings and trial.

The issues of liability and damages were bifurcated pursuant to Rule 42, *Federal Rules of Civil Procedure.* The parties have agreed that the malady suffered by plaintiff in March 1977 was GBS. Therefore, plaintiff needs only to establish a causal connection between the vaccination and his GBS in order to recover damages. He is not required to prove any theory of liability. *See,* Stipulation and Final Pretrial Order, paragraph IX, *In Re Swine Flu Immunization Products Liability Litigation,* M.D.L. No. 330, Misc. No. 78–0040 (D.D.C.1979).

The following are the Court's[3] findings of fact and conclusions of law, as required by Rule 52(a), *Federal Rules of Civil Procedure,* on the sole issue before us, *i. e.,* causation. The chronology of medical events is persuasive in our determination of causation.

## II

On November 12, 1976, plaintiff, then age twenty-nine, received a swine flu vaccination administered pursuant to the Swine Flu Act. Prior to the inoculation, plaintiff had been in excellent health. Testimony revealed that he was an extremely hard worker and an energetic individual. For approximately three weeks after his immunization, Mr. Lima's health remained excellent. However, on about December 1, 1976, plaintiff developed flu-like symptoms that persisted throughout the winter. These symptoms were characterized by a general loss of energy. During this period, he often left work early and cancelled social engagements. It is one of the plaintiff's theories that these symptoms marked the onset of a sub-clinical GBS which was triggered into its acute phase in March of 1977 (various theories of the parties are discussed below).

Approximately seven to ten days prior to his hospitalization on March 7, 1977, Mr. Lima developed a flu-like illness characterized by diarrhea, fever of 103°, abdominal cramps, running nose and chills. The day before being hospitalized plaintiff experienced blurry vision, numbness of his mouth and weakness in his legs. On the morning of March 7, while at work, plaintiff's symptoms worsened—his vision was blurred and he developed a lisp in his speech. In addition, Mr. Lima testified his "left hip felt like it was going out of its socket." That afternoon, Mr. Lima visited a neurologist, Sarahlee McGroaty, M.D., who immediately hospitalized plaintiff.

Upon admission to the hospital, plaintiff was diagnosed as suffering from GBS. His cerebrospinal fluid protein level was slightly elevated and then returned to normal upon its second testing, ten days later. Mr. Lima remained hospitalized for almost three months. During that time, he was severely paralyzed and underwent surgery to assist his breathing. His respiratory muscles, as well as his cranial nerves and limbs, had been paralyzed. At the time of trial, plaintiff had substantially recovered and demonstrated only mild residual effects of his GBS.

## III

Guillain-Barre syndrome is a rarely occurring neurologic disorder of the peripheral nervous system. The peripheral nervous system begins where the nerves leave the spinal cord and is comprised of the nerves which extend throughout the body. GBS is typically characterized by symmetrical rapidly ascending paralysis that occasionally leads to respiratory failure and death. The disease was first described in 1859 by Dr. Landry who reported ten patients with a

---

**3.** It is expressly provided that trials against the United States under FTCA are to be to the Court without a jury 28 U.S.C. § 2402.

progressive paralysis beginning in the distal extremities. Two of Landry's patients died of respiratory insufficiency. In 1916, the disease was again described by Drs. Guillain, Barre and Strohl. They reported two cases of ascending paralysis associated with an increase in the cerebrospinal fluid protein level. Guillain and Barre distinguished the disorder they reported from Landry's paralysis based upon the non-fatal outcome of their patients. At a later date, the two disorders were recognized as the same disease process. However, controversy over definitions and diagnostic criteria persists.

To date, medical science has not yet established the syndrome's exact cause, or etiology. However, GBS has been associated with numerous antecedent, or prodromal, medical events. Of these, the most common event is a viral infection, either respiratory or gastroenteric. Other recognized antecedent events temporally associated include bacterial infections, surgery and vaccines. Dyck, *et al., Peripheral Neurology*, Chap. 56, 1111–1114 (1975). Since 1976, the swine flu vaccine has been established as a causative factor in GBS. Schonberger *et al., Guillain-Barre Syndrome Following Vaccination In The National Influenza Immunization Program*, American Journal of Epidemiology, Vol. 110, No. 2, 105, 1979. The interval between the prodromal infectious episode and the onset of symptoms is variable; most frequently it is one to three weeks. With respect to the swine flu vaccine being the antecedent event, there is a strong suggestion that the onset of GBS can occur up to ten weeks after the innoculation. Schonberger *et al.* It must be emphasized that in approximately fifty percent of the cases, there is no identifiable antecedent event. Dyck *et al.*, at 1114.

While controversy exists over the exact parameters of GBS, most authorities agree that the most significant clinical features of GBS are progressive bilateral motor weakness and loss or diminution of tendon reflexes. *See, e. g., Criteria for the Diagnosis of Guillain-Barre Syndrome of an ad hoc Committee of the NINCDS*, Annals of Neurology, Vol. 3, No. 6 June 1978. The severity of weakness covers a wide spectrum from mild ataxia (failure of muscle coordination) to total paralysis of every motor and cranial nerve. In most instances, the weakness is first noticed in the legs and gradually ascends through the body. Rarely are there solely sensory symptoms in the absence of motor debility. Tendon reflexes are usually absent in affected areas although a flicker of activity may remain in mild cases. Dyck *et al.* at 1121–1123. Other clinical symptoms include facial paralysis, impaired swallowing and chewing, and respiratory difficulties.

The onset of symptoms is usually acute or subacute. The syndrome progresses rapidly and the disease reaches its peak after two weeks in fifty percent of the cases; after three weeks in eighty percent; and after four weeks in ninety percent. In other words, the disease peaks within one month of onset in a vast majority of the cases. A stable period of brief duration precedes the recovery phase that usually advances to completion within a period of weeks to a few months. Satisfactory recovery occurs by the end of four to six months in eighty-five percent of the cases, although some patients show permanent deficits of varying severity. *Id.* at 1121.

The exact mechanism by which GBS occurs has not been scientifically proven. However, it is generally accepted that GBS occurs from an abnormal immune response to an antigenic stimulus. In other words, the immune system, which is designed to protect the body against disease, becomes misdirected and attacks the nervous system instead of attacking the antigen (*e. g.*, a virus or vaccine). This results in the destruction of the myelin sheath [4] surrounding certain nerve fibers which in turn produces improper nerve conduction. The consequent effect is motor weakness, paralysis or sensory impairment.

4. The myelin is a fatty substance which forms a protective sheath around the nerve fibers.

## IV

### A

At trial, the following medical experts testified [4a] concerning the causal connection, if any, between the swine flu immunization and plaintiff's GBS:

Martin G. Lewis, M.D., Professor and Chairman, Department of Immunopathology, Loyola University School of Medicine, Chicago, Illinois;

Peter Quintero, M.D., Assistant Professor of Neurology, University of Colorado Medical Center;

Carl Johnson, M.D., Associate Professor of Social and Public Health, University of Colorado Medical Center;

Charles Poser, M.D., Professor and Chairman, Department of Neurology, University of Vermont School of Medicine;

Sarahlee McGroaty, M.D., Clinical Neurologist, Denver, Colorado;

Peter Kohler, M.D., Professor and Chairman, Department of Immunology, University of Colorado Health Center;

Steven Ringel, M.D., Associate Professor of Neurology, University of Colorado Health Center;

Robert Lisak, M.D., Professor of Neurology, University of Pennsylvania Medical School.

In support of plaintiff's allegation of causation, several doctors rendered their medical opinions and analyses. Essentially, their theories can be categorized into three basic positions. First, the swine flu vaccination on November 12, 1976 directly caused plaintiff's GBS in March 1977. Second, plaintiff experienced a chronic or smoldering GBS beginning December 1, 1976 and which was exacerbated in March 1977 by the viral illness (diarrhea, fever, etc.). Third, the swine flu vaccine sensitized Mr. Lima's immune system to a greater susceptibility to GBS; this susceptibility was triggered by the virus in March 1977.

### B

Plaintiff's first theory of causation was advanced by Dr. Poser as an alternative theory. It was his opinion that there was a possibility that the swine flu vaccination directly caused the GBS. This was based upon his belief that vaccinations can be the cause of neurologic disorders up to a year following inoculation. However, there is sparse epidemiologic data or reports in the medical literature to support Dr. Poser's theory of direct causation in this case. The weight of medical authority is that GBS usually follows an antecedent viral infection by no more than four weeks. With respect to the swine flu vaccine, one study indicates a causal connection between inoculation and the onset of GBS up to ten weeks.[5] The maximum interval causally linking GBS to the swine flu vaccine is the subject of debate in the medical and legal communities. We have considered and reject the theory that there was a direct causal relationship between the immunization in November 1976 and Mr. Lima's GBS in March 1977.

Plaintiff's second theory of causation, i. e., that of a smoldering or subclinical GBS, was advanced by Dr. Quintero. The basis of the theory is that within a few weeks after inoculation, the patient develops "subclinical bridging symptoms" which persist temporarily and then are incited into an acute phase of GBS. In the instant case, Dr. Quintero testified that plaintiff's general malaise and cold-like symptoms were the beginning of his neurologic difficulties. However, on cross-examination, he admitted that these symptoms are general to many other maladies.

We are not persuaded that Mr. Lima suffered a smoldering GBS in the winter of 1976–77. At best, it is highly speculative

---

4a.   At the close of the trial, defendant moved to admit a portion of the deposition testimony of Dr. Milton Alter. Plaintiff objected on several grounds. We sustain plaintiff's objection to the admission of portions of Dr. Alter's depositions.

5.   Schonberger *et al*, Guillain-Barre Syndrome Following Vaccination In the National Influenza Immunization Program, *American Journal of Epidemiology, Vol. 110, p. 105 (1979)*.

that his symptoms were neurologic. "Smoldering GBS" is not recognized by Drs. Ringel and McGroaty. The reported cases of chronic GBS are not analogous to smoldering GBS since they involve clearly diagnosed cases of GBS which persist for a substantial period.[6] This was not the course of Mr. Lima's illness.

Plaintiff's third theory of causation, i. e., that the swine flu vaccine sensitized plaintiff's immune system to a greater susceptibility to GBS, presented a well defined conflict in expert testimony. The theory was advanced primarily by Drs. Lewis and Poser and subscribed to by Dr. Quintero.

Dr. Poser's opinion was based upon the historic relation between vaccines and nervous system disorders. In addition, he testified that the ten week period established by the Center for Disease Control study (Schonberger et al.) as the maximum interval for a causal relation between the vaccination and the onset of GBS is artificial. In his opinion, sixteen weeks is not beyond the realm of possibility for a causal nexus to exist.

Drs. Lewis and Quintero primarily based their opinions regarding sensitization as the causal mechanism on a belief that the interval between the diarrhea and the acute onset of GBS was too short for the diarrhea to act alone in causing the autoimmune response. They both testified that the interval between an antigenic challenge and an immune response is two to three weeks. Where there is a shorter interval, one can conclude that there has been a prior sensitization, according to Dr. Lewis.

Dr. Lewis also testified concerning blood serum tests which purport to establish a causal connection between the swine flu vaccine and GBS[7]. The methodology utilized in Dr. Lewis' tests involve reacting a person's blood serum with both peripheral nerve antigen and the swine flu vaccine. Dr. Lewis has analyzed over 150 blood sera in this manner. Nine different samples[8] of plaintiff's blood taken from 1976–1980 were tested by Dr. Lewis. Three samples evidenced a positive reaction to both the peripheral nerve antigen and the swine flu vaccine. The other six samples yielded two negative reactions.

Dr. Lewis testified that these results establish a causal connection between the vaccination and plaintiff's GBS. However, we are not persuaded that this conclusion logically follows. Initially, it is to be noted that a person who received a swine flu inoculation is expected to have antibodies against the vaccine and a person who suffered GBS is expected to have a reaction to peripheral nerve antigen (testimony of Drs. Lisak and Kohler). Therefore, two positive reactions by a majority of the GBS patients who have been inoculated does not establish a causal connection between the vaccine and GBS.

Plaintiff asserts that since his serum yielded two positive reactions on three occasions in the summer of 1977 and two negative reactions on all other sera, a causal link is established. In Dr. Lewis' opinion, this confirms the fact that two positive reactions do not occur by chance. We are of the view that this conclusion is conjectural. It is premised upon the test results of one person's blood serum and cannot be the basis of a scientific conclusion (testimony of Dr. Lisak).

In addition to the foregoing shortcomings of Dr. Lewis' opinion, there are other reasons for not finding his tests persuasive on the issue of causation. First, his results have not been published in any medical literature and have not, therefore, received acceptance by the medical community.

---

6. See Authorities in VI below.

7. Dr. Lewis' opinion based upon these tests has previously been admitted in evidence over the government's objection under Rule 703, *Federal Rules of Evidence* in *Bean v. United States*, # 79–571 (D.Colo. Aug. 19, 1980).

8. Dr. Lewis analyzed only one blood sample from each of the patients other than Mr. Lima. However, since plaintiff is a microbiologist and

Furthermore, Drs. Lisak [9] and Kohler testified that the methodology and controls used by Dr. Lewis were not reliable. They questioned the scientific credibility and persuasiveness of the study.

### C

■ To further support his allegation of causation, plaintiff offered the testimony of Dr. Johnson. In rendering his opinion, Dr. Johnson primarily relied on three exhibits, i. e., plaintiff's exhibits 3, 56 and 57. These exhibits purport to establish an increased incidence of GBS in Colorado in March 1977. At trial, defendant moved to strike the testimony of Dr. Johnson on the grounds that (a) the data (plaintiff's exhibits 3 and 57) are not the type reasonably relied on by experts in epidemiology and neurology and therefore, Dr. Johnson's opinion testimony is inadmissible under Rule 703, *Federal Rules of Evidence*; (b) the epidemiologic data about which he testified is unreliable and is inadmissible hearsay under Rules 801, 802 and 803, *Federal Rules of Evidence*; and (c) Dr. Johnson was not listed as a witness in any pretrial pleadings and the documents upon which he relied were not furnished to the government until the day of trial. Accordingly, this surprise denied the defendant an opportunity to effectively cross-examine the witness. For the reasons set forth below, we grant the motion to strike the testimony of Dr. Johnson.

Plaintiff's exhibit 3 is a summary of all cases of GBS treated in Colorado hospitals from October 1976 to August 1977. The data was compiled by plaintiff's attorney who contacted Colorado hospitals and requested statistics pertaining to patients discharged with a final diagnosis of GBS. Much of plaintiff's exhibit 57, which also reports cases of GBS in Colorado during that time period, was obtained from computer retrieval of cases listed under ICDA [10] Code 354. This code contains more than just cases diagnosed as Guillain-Barre syndrome. It appears from the exhibit that the medical clerks, who are not doctors, decided which cases under Code 354 were GBS. On this point we note that the diagnosis of GBS is a very difficult and complex task and is the subject of constantly evolving medical knowledge.

Plaintiff's exhibit 57 is in response to follow-up letters to the hospital from plaintiff's attorney. It contains information supplied by the medical clerks as to the date the patient received the swine flu vaccination, date of onset of neurologic symptoms, and dates of admission to and discharge from the hospital.

In formulating his opinion that plaintiff's GBS was related to the swine flu vaccination, Dr. Johnson relied on exhibits 3 and 57.[11] For Dr. Johnson's opinion testimony to be admissible in evidence, exhibits 3 and 57 must be "of the type reasonably relied on by experts in (neurology or epidemiology) in forming opinions or inferences upon the subject," Rule 703, *Federal Rules of Evidence*. This rule was intended to broaden the basis for expert opinion and to bring the judicial practice more in line with the practice of experts in the medical profession. Advisory Committee Notes to Rule 703, *Federal Rules of Evidence*. We recognize that, under Rules 702 and 703 of the *Federal Rules of Evidence*, the opinion of an expert may be based upon hearsay.[12] At

personally drew samples of his blood, Dr. Lewis received nine samples from him.

9. Dr. Lisak has published several papers on neuroimmunology and Guillain-Barre Syndrome.

10. ICDA is the acronym for "International Classification of Diseases Adapted."

11. We need not address the admissibility of exhibits 3 and 57 since the parties have stipulated that they are admissible for the limited purpose that they were referred to by several witnesses in the case. The stipulation further provides that the exhibits are not to be admitted for the truth or veracity of their recitals, but simply to clarify the testimony.

12. Rule 702 states as follows: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as a witness by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." Rule 703 provides: "The facts or data in a

trial, Dr. Johnson testified that epidemiologists would rely on the type of data contained in exhibit 57. However, three physicians testified that they would not rely on this data. Dr. Ringel, a board certified neurologist, testified that neurologists often rely on epidemiologic studies in formulating opinions as to the cause of neurologic disease. He testified that exhibit 57 was unreliable because there was no independent determination by a neurologist as to whether a case listed in the exhibit was GBS.

Dr. Lawrence Schonberger, an epidemiologist at the CDC in Atlanta, Georgia, has testified in another swine flu case, *Alvarez v. United States*, 495 F.Supp. 1188 (D.Colo. 1980). The transcript of his testimony in *Alvarez* was admitted in evidence in this case and identified as plaintiff's exhibit 5. Dr. Schonberger testified that initially the CDC used ICDA Code 354 to determine if there was an increased incidence of GBS. He stated that this code led them astray because it indicated cases of GBS "manyfold greater than what more specific types of surveillance would reveal" (plaintiff's exhibit 5 at 27–28).

The Court finds and concludes that the opinion testimony of Dr. Johnson is inadmissible and is hereby stricken from the record. It is based upon hearsay evidence not reasonably relied upon by experts in neurology and epidemiology. Dr. Johnson testified that he did not individually review the medical records to determine if the reported cases were actually GBS. Furthermore, cross-examination of Dr. Johnson concerning exhibit 57 indicated that it contained cases which (a) were not Guillain-Barre syndrome; (b) were counted twice; (c) were from persons inoculated in states other than Colorado; (d) patients counted had questionable diagnoses; and (e) the vaccination date was recorded as being during a time when the national moratorium on the immunization was in effect.

While we recognize that Rules 702 and 703 of the *Federal Rules of Evidence* liberalize the basis for admitting opinion evidence, we are of the view that Dr. Johnson's opinion testimony does not reach the threshold standards for admissibility. The data upon which he relies is of a rudimentary nature and is not of the type reasonably relied on by experts in epidemiology and neurology. The technique employed in compiling the data is not of the caliber used in the field of epidemiology and medical statistics and therefore, cannot form the basis of Dr. Johnson's opinion testimony. We have stricken Dr. Johnson's testimony. However, assuming it is admissible, the testimony has limited persuasive effect. It clearly does not tip the scales in favor of causation.

**D**

In support of the government's position, several doctors testified that there was no causal connection between the immunization and plaintiff's GBS. Dr. Ringel testified that the time interval between the inoculation and the onset of neurologic difficulties was too great for a causal nexus to exist. He further testified that the onset of symptoms seven to ten days following the viral infection was consistent with the typical etiologic picture of GBS. In his experience, the onset of GBS is usually within two weeks of an identifiable prodromal event.

Dr. Ringel testified that there was no evidence in the medical literature to support plaintiff's sensitization theory or to establish a causal connection between GBS and an event seventeen weeks earlier. In his opinion, the studies conducted at CDC were excellent. Dr. Schonberger reported that a nexus between the vaccine and the onset of GBS existed for only ten weeks after inoculation. Dr. Ringel believes that this period is a liberal interpretation of the available data. Dr. Ringel noted that the

particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied on by experts in

the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

Schonberger study reveals that 70 percent of the increased incidence of GBS occurred within three weeks of vaccination. In addition, prior to this study, it was widely accepted that the maximum interval between a prodromal event and the onset of GBS was four weeks *see, e. g.,* Dyck *et al.* at 1113. Dr. Ringel further testified that GBS is characterized by an acute, or rapid, onset of weakness. This testimony is supported by the great weight of medical authority. *See, e. g.,* Dyck *et al., supra,* p. 1110 (GBS is an acute or subacute evolving paralytic disease); Lesser *et al, Epidemiologic Features of Guillain-Barre Syndrome,* Neurology, Vol. 23, No. 12 (1973). This factor militates against plaintiff's contention that his GBS began in December 1976 and gradually worsened until the acute phase began in March 1977. By definition, the acute onset of weakness marks the beginning of GBS.

## V

In addition to the expert testimony, the Court also received extensive medical literature pertaining to Guillain-Barre syndrome. Much of the literature supported defendant's position that no causal relation existed between the vaccination and plaintiff's illness.

The seminal epidemiologic study concerning the relationship between the swine flu vaccine and GBS is by Schonberger *et al., supra.* As previously stated, it establishes a causal connection between the vaccination and onset of GBS within ten weeks of vaccination. This study is the most extensive analysis ever undertaken to determine the incidence and etiology of GBS; 1098 cases of Guillain-Barre were examined. Dr. Schonberger's paper presents an analysis of data received by the CDC through March 1978 on cases of GBS with onset between October 1, 1976 and January 31, 1977. As previously noted, prior to this study, it was widely accepted that the maximum interval between an inciting event and the onset of GBS was four weeks. *See, e. g.,* Dyck, *et al., supra.*

Another study (plaintiff's exhibits 2 and 12) from the Michigan Health Department confirms the results reached by Dr. Schonberger that a causal connection existed for ten weeks at most. In Michigan, cases of GBS with onset from July 1976 through June 1977 were analyzed. The study indicates that in Michigan, there was an increased risk of contracting GBS in the vaccinated population during November and December of 1976. After that time, the study reveals no significant relation between the vaccine and GBS.

Since 1977, there has been an ongoing surveillance conducted by the CDC for GBS, regardless of whether the patient received a swine flu vaccination. The surveillance has not indicated an increase in the incidence of Guillain-Barre syndrome over previous years (excluding the period from October 1976 to January 1977). This stability in the rate of occurrence of GBS militates against plaintiff's sensitization theory. If the vaccine acted as a sensitizing agent, we would have an increase in the incidence of GBS since 1977.

Defendant's exhibit 42, an article by Kennedy *et al, Guillain-Barre Syndrome, A 42-Year Epidemiologic and Clinical Study,* conducted at the Mayo Clinic in Rochester, Minnesota, further negates plaintiff's theory of causation. Drs. Lewis and Quintero testified that if the interval between a viral infection and the onset of neurologic symptoms is less than two weeks, the immune system must have previously been sensitized. However, the Kennedy study reports twelve cases of GBS with a preceding gastrointestinal infection. In eleven of those cases, the gastrointestinal infection occurred within seven days prior to the onset of neurological symptoms. This study makes no mention of prior sensitizing agents as the possible cause for the interval. It also strongly counters the testimony of Drs. Lewis and Quintero that the time interval between plaintiff's diarrhea and acute onset of GBS was too short for the diarrhea alone to be the causative factor in plaintiff's neurologic illness.

## VI

We comment on several articles advanced by plaintiff which purport to give credence

to the smoldering GBS theory. Plaintiff submits that these authorities establish that GBS may have a slow progressive course. These exhibits demonstrate that GBS, once clinically manifested, can progress over a period of many months, or even years, before it stabilizes. We do not refute this contention. However, it is not analogous to Mr. Lima's case. Once his polyneuropathy became clinically apparent, in March 1977, it progressed rapidly.

Plaintiff's exhibit 27, is an article by Hinman and McGee, *Guillain-Barre Syndrome With Slow Progressive Onset and Persistent Elevation of the Spinal Fluid*, Annals of Internal Medicine, Vol. 67, No. 5, p. 1007, Nov. 1967. It describes four patients in which the symptoms, after a clear onset, slowly progressed over many months. All four patients demonstrated a markedly elevated spinal protein level during and after their illness. Plaintiff's exhibit 31, *A Case of Chronic Demyelinating Polyneuropathy Resembling the Guillain-Barre Syndrome*, Torvick and Lundar, J. of Neurol Sciences 1977, 32:45–52, reports a patient whose neurologic symptoms progressed over six months and resulted in his death. The patient, two weeks after a minor respiratory infection, developed diplopia, weakness, paresthesia and decreased sensation in the distal part of all four limbs. These symptoms progressed steadily and the patient was admitted to the hospital six weeks later. He then developed paresis and sensory loss throughout his entire body. The patient died from respiratory insufficiency seven months after the onset of neurologic symptoms.

As previously noted, the cited articles establish that GBS, once clinically apparent, can progress over many months. However, we must emphasize that this was not the course of Joseph Lima's illness. We do not equate his generalized malaise beginning in December, 1976 as the onset of neurologic symptoms. The patients in plaintiff's exhibits 37 and 51 had clearly identifiable neurologic symptoms. Plaintiff had no specific neurologic complaints until March 1977. His complaints during the winter of 1976–1977 can be attributed to numerous different maladies.

VII

In actions brought pursuant to the FTCA, the liability of the United States is governed by the law of the place where the alleged wrongful act or omission occurred. 28 U.S.C. §§ 1346(b), 2674; *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). In the instant action, the applicable law is that of the state of Colorado.

Plaintiff has the burden of proving by a preponderance of the evidence that the swine flu vaccine was the proximate cause of his GBS. *Exchange National Bank of Colorado Springs v. Sparkman*, 191 Colo. 534, 554 P.2d 1090, 1092 (1976). Mere conjecture or speculation will not establish a probability. *O'Connor v. Boulder, Colorado Sanitarium Assn.*, 107 Colo. 290, 111 P.2d 633, 635 (1941). In order for the swine flu vaccine to be a proximate cause of plaintiff's GBS, it must be shown that the illness would not have occurred but for the inoculation or that the inoculation was a contributing factor in bringing about the disease. *Reaves v. Horton*, 33 Colo.App. 136, 518 P.2d 1380 (1973), *rev'd on other grounds*, 186 Colo. 149, 526 P.2d 304 (1974); *Moore v. Standard Paint and Glass Co. of Pueblo*, 145 Colo. 151, 358 P.2d 33 (1969); *see also, Colorado Jury Instructions 2d, Civil* §§ 9:26 and 9:28. The question of proximate causation is one of fact and the fact finder alone may weigh conflicting evidence and determine the credibility of witnesses and the weight to be accorded expert testimony.

CONCLUSION

While there was a conflict in the medical testimony concerning the causal connection between the immunization and plaintiff's GBS, we believe that plaintiff has failed to sustain his burden of proof. It is not probable that the vaccine was a contributing factor in his neurologic illness.

The theories advanced by the experts who testified on plaintiff's behalf are speculative and are not generally supported in

the medical literature. On the other hand, the opinions of Drs. Ringel and Lisak comport with the present state of medical knowledge. They are in accord with the widely accepted epidemiologic studies. Where, as here, the exact organic cause of a disease cannot be scientifically isolated, epidemiologic data becomes highly persuasive. The epidemiologic data in the instant case does not support plaintiff's allegations of causation. In addition, the viral infection suffered by Mr. Lima immediately prior to his hospitalization is a medical event which is known to precede GBS. Its presence and the length of time between the vaccination and onset of diagnosable neurologic symptoms make it less probable that the vaccine was a contributing factor in plaintiff's GBS.

In reaching this conclusion, we are not unmindful that a different result was reached in *Thompson v. United States, supra.* In *Thompson,* the court accepted the smoldering GBS theory and found that plaintiff experienced symptoms of GBS within three weeks of inoculation. While common issues of fact are present in these swine flu cases, we underscore that the facts of each case must be evaluated on an individual basis. Our conclusions must rest on what is shown to the Court in the crucible of a trial. The evidence in this case does not persuade us that plaintiff's GBS began until the beginning of March 1977, sixteen weeks following his inoculation. Additionally, we are of the view that Mr. Lima's generalized weakness in the winter of 1976–1977 was not related to the vaccine or initial symptoms of GBS. Finally, we are of the view that the most credible and soundest medical opinions were expressed by Drs. Ringel, Lisak and Kohler. Additionally, their education, clinical experience and research in the area entitle their opinions to great weight.

In sum, we find and conclude that plaintiff has failed to establish by a preponderance of the evidence that the swine flu vaccine was a contributing factor, or a proximate cause, of his Guillain-Barre syndrome.

ORDER

IT IS HEREBY ORDERED that this action be dismissed with prejudice. The Clerk of the Court is directed to enter judgment in favor of defendant, United States, and against plaintiff, Joseph Lima.

Each party is to pay his or its own costs.

