**Gina MIGLIORINI, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 78–755 Civ. T–K.

United States District Court, M. D. Florida, Tampa Division.

Aug. 14, 1981.

As Amended Dec. 1, 1981.

Louis M. Sibler, Cone, Owen, Wagner, Nugent, Johnson & McKeown, West Palm Beach, Fla., for plaintiff.

Mary Ann Murphy, Trial Atty., Torts Branch, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

KRENTZMAN, District Judge.

This action is brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., and the National Influenza Immunization Program of 1976, 42 U.S.C. § 247b. The plaintiff seeks compensatory damages for injuries alleged to have resulted from her inoculation with the swine influenza vaccine. The parties have stipulated that plaintiff developed Guillain Barre Syndrome (GBS) subsequent to her inoculation and that the sole issues for the Court are causation and, if relevant, damages.[1]

This action was filed on September 12, 1978, and subsequently transferred by the Judicial Panel on Multidistrict Litigation to the United States District Court for the District of Columbia for coordinated pre-trial proceedings in *In re Swine Flu Immunization Products Liability Litigation*, M.D.L. No. 330, Misc. No. 78–0040 (D.D.C. 1979), pursuant to 28 U.S.C. § 1407. On December 20, 1979, the case was remanded to this Court for further proceedings. A non-jury trial on the issues of liability and damages was held from April 6 to 13, 1981.

## I. PLAINTIFF'S MEDICAL HISTORY

Gina Migliorini was nineteen years of age when she was inoculated with the swine influenza vaccination on November 16, 1976, at the Tyrone Square Mall, St. Petersburg, Florida. The plaintiff and various friends and relatives testified that following the flu shot, plaintiff had muscle aches, difficulty climbing stairs, fatigue, hand tremors, blurry vision, fever, dry cough and an insatiable thirst. Plaintiff did not visit a physician for these symptoms.

On April 13, 1977, plaintiff visited her family physician, Henry Mela, Jr., M.D., and complained of numbness of her feet and arms. Dr. Mela felt the symptoms were a reaction to a drug plaintiff was taking for gum infection, prescribed Benadryl and instructed her to discontinue all other medications. The following day, plaintiff was taken back to Dr. Mela's office by her mother. The records of that office visit reflect that she was unable to blink or completely close her right eyelid and had numb lips. Dr. Mela admitted plaintiff to Bayfront Medical Center, in St. Petersburg, Florida. There she was examined by Dr. Mela, two neurologists, Richard A. Weaver, M.D., and Allen O. Smith, M.D., and a neurosurgeon John M. Thompson, M.D. Dr. Thompson's April 15, 1977 neurosurgical consultation contains the following statement: "[i]t is of interest that on Monday, April 11th she started developing numbness of both feet. She has had this numbness ever since." Dr. Smith's discharge summary notes a history of herpes simplex infections with an outbreak of the same within the last month. He also wrote "[p]atient

1. The Final Pretrial Order of the transferee court, paragraph IX, provides that where the United States stipulates that a plaintiff develops GBS following inoculation with the swine influenza vaccine, no theory of liability need be established by the plaintiff. Plaintiff therefore need only prove causation to recover.

had an upper respiratory infection one or two weeks prior to the onset of illness." Dr. Weaver's April 20, 1977, neurologic consultation notes that the plaintiff had a history of a mild upper respiratory infection a few weeks prior to her illness.

Plaintiff's condition was diagnosed as Guillain Barre Syndrome shortly after her admission. During the hospitalization, the paralysis progressed to involvement of her face, all extremities, and the muscles which control respiratory and bladder function. On April 29, 1977, plaintiff was intubated and placed on a respirator. On May 3, 1977, a tracheostomy was performed and remained in place until May 20, 1977. The patient also experienced tachycardia and required catheterization during her hospitalization. On May 1, 1977, plaintiff's paralysis began regressing. On May 27, 1977, she was discharged home, at which time she was able to walk short distances with assistance. At the time of trial, plaintiff had residual facial paralysis and hand tremors.

## II. GUILLAIN BARRE SYNDROME

Much of the expert testimony at trial focused on Guillain Barre Syndrome. A number of published medical articles and treatises were admitted into evidence and considered by the Court. Guillain Barre Syndrome is an acutely evolving ascending paralytic disease of the peripheral nervous system[2] of unestablished etiology. Arnason, *Inflammatory Polyradiculoneuropathies*, 1110, Chapter 56 in Dyck, et al., *Peripheral Neuropathy* (1975). In the United States it occurs at the rate of one to two persons per hundred thousand persons per year. The condition is sometimes designated as Landry-Guillain-Barre-Strohl Syndrome in recognition of its description, first in 1859 by Landry and again in 1916 by Guillain, Barre and Strohl. Although the precise mechanism of GBS is unknown, it is generally thought that the disorder represents an aberrant immune response.

The characteristic pathologic lesion is lymphocytic cellular infiltration of the peripheral nerve and destruction of myelin

there. In GBS patients, lymphocytes attack the myelin, the fatty substance which surrounds or "insulates" the peripheral nerves. The resulting segmental demyelination impairs the nerves' ability to conduct electrical impulses from the brain which control the reflexes and movement of certain muscles.

Attempts to isolate a viral or microbial agent responsible for GBS have failed. A mild respiratory or gastrointestinal infection precedes the symptoms of GBS by one to three weeks in approximately half the patients. In many cases, no preceding event can be identified.

The NINCDS Criteria are the generally accepted criteria for the diagnosis of GBS. Asbury, Arnason, Karp, McFarlin, *Criteria For the Diagnosis of Guillain Barre Syndrome*, Ann. Neurol. 3:565–566, 1978. The features required for diagnosis are progressive motor weakness of more than one limb and areflexia. Most GBS patients show evidence of slowed nerve conduction on electrodiagnostic testing and an increase of cerebrospinal fluid protein on lumbar puncture during the acute phase of the illness. There is a characteristic progression as the paralysis develops. Symptoms and signs of motor weakness develop rapidly. Fifty percent of patients reach the nadir of neurological involvement within two weeks, eighty percent by three weeks and ninety percent by four weeks. Recovery usually begins two to four weeks after the progression stops.

## III. EXPERT TESTIMONY ON CAUSATION

Expert medical testimony of several prominent neurologists, neuroimmunologists, neuroepidemiologists, and a neurochemist was presented to the Court on the issue of causation.

Plaintiff called William Sheramata, M.D., a neuroimmunologist and Associate Professor of Neurology, University of Miami, Joseph Bellanti, M.D., a pediatrician with expertise in allergy and immunology and Di-

2. The central nervous system consists of the brain, brain stem, and the spinal cord. The peripheral nervous system begins where the nerves leave the spinal column and extends throughout the body.

rector of the International Center for Interdisciplinary Studies of Immunology at Georgetown University, Washington, D. C., Martin Lewis, M.D., Chairman of the Department of Pathology at Loyola University in Chicago, Milton Alter, M.D., a neuroepidemiologist and Chairman of the Department of Neurology at Temple University Hospital in Philadelphia, and Robert Nash, M.D., a clinical neurologist, formerly in practice in Virginia Beach, Virginia, currently in practice in Saudi Arabia.

The United States called Raymond D. Adams, M.D., Bullard Professor of Neuropathology, Emeritus, Harvard Medical School, Consultant Neurologist and former Chief of Neurology Service, Massachusetts General Hospital, Boston, Massachusetts, and Director, Eunice K. Shriver Research Center, Boston, Medicin Adjoint, L'Hopital Cantonale de Lausanne, Lausanne, Willard Allen Hauser, M.D., a neuroepidemiologist and Associate Professor of Neurology, Gertrude A. Sergievsky Center College of Physicians and Surgeons, Colombia University, New York, Edward A. Neuwelt, M.D., Assistant Professor of Neurosurgery and Biochemistry, University of Texas Medical School, Dallas, Texas and Steven W. Brostoff, Ph.D., Professor of Neurology and Professor of Basic and Clinical Immunology and Microbiology, at the Medical University of South Carolina, Charleston, South Carolina.

Plaintiff advanced more than one theory of causation. Drs. Bellanti, Lewis, Nash and Sheramata testified that plaintiff developed chronic or relapsing inflammatory pdyradiculoneuropathy shortly after her inoculation with the swine influenza vaccine, which condition progressed to an acute GBS in April, 1977. Dr. Sheramata testified that the swine influenza vaccination contained P $_2$ protein which caused plaintiff's GBS.

Regardless of the theory, plaintiff's experts testified that the vaccine caused her GBS, and placed heavy reliance on plaintiff's testimony and letters from friends and relatives regarding early symptoms of GBS or "smouldering symptoms" between the mid-November, 1976 and mid-April 10, 1977. The letters were solicited by counsel for plaintiff by letters from him which informed prospective witnesses of plaintiff's theory of the case and related that shortly after her inoculation with the swine influenza vaccination, plaintiff developed a dry cough, hand tremors, muscle aches, headaches, dizziness and imbalance. Drs. Bellanti, Lewis and Nash also relied on a diary authored by Lois Migliorini, plaintiff's mother, which purportedly documented the "smouldering symptoms" and plaintiff's hospital and post-hospital course. Plaintiff's mother testified that the diary was written sometime after plaintiff was released from the hospital. Finally, plaintiff's experts relied on medical history taken in December, 1980, by plaintiff's expert witness, Dr. Sheramata. Dr. Sheramata's medical history documents that plaintiff suffered fatigue, dry cough, problems with her voice cracking during vocal lessons, muscle aches and pains, particularly in the legs, sore throat and other symptoms beginning two days after her inoculation with the swine influenza vaccination. Plaintiff's experts dismissed the fact that these "smouldering symptoms" do not appear in the medical histories taken in April, 1977 and also disregarded the testimony of Leopoldo Sabater, a fellow student who attended St. Petersburg Junior College with plaintiff when she started taking classes there in early January, 1977. Mr. Sabater, who dated plaintiff and married her on March 11, 1977, testified that plaintiff was in good health until April 11, 1977. Specifically, Mr. Sabater testified that plaintiff did not have the symptoms documented by Dr. Sheramata, friends and family from her inoculation until the onset of her acute GBS on April 11, 1977. Additionally, during Dr. Sheramata's December, 1980 examination of her and at trial, plaintiff denied having an upper respiratory infection one to two weeks prior to her hospitalization, which infection was documented in the medical history section of the Bayfront Medical Center records by two neurologists who treated her, Drs. Weaver and Smith.

### A. Relapsing Inflammatory Polyradiculoneuropathy

Plaintiff's experts found support for smouldering GBS primarily in the following

passage authored by Barry G. W. Arnason, M.D., Chapter 56, entitled *Inflammatory Polyradiculoneuropathies*, in Dyck, et al., *Peripheral Neuropathy*, 1135 (1975), which describes a disorder known as "relapsing inflammatory polyradiculoneuropathy":

It has been pointed out earlier that recovered completely asymptomatic cases of acute inflammatory demyelinative polyradiculoneuropathy continue to show mild but definite lymphoid infiltrates in nerve months or years after complete clinical recovery (Asbury et al., 1969). This finding suggests that subclinical disease smolders on in a significant proportion of recovered cases. It is probable, therefore, that clinical recurrences represent flare-ups of an indolent, clinically silent, ongoing process.

Dr. Arnason's description of that disorder also contains the following passage:

The clinical symptoms of relapses do not differ in essentials from those of the acute monophasic form of the disease. Motor loss predominates, reflexes are lost, and motor and sensory conduction velocities are slowed markedly.

*Id.* at 1134.

The author is describing a condition in which the condition "smoulders on" *after* the patient recovers from an attack of acute neurologic disease with motor loss, areflexia, and slowed conduction velocities. We now turn to the question of whether the symptoms plaintiff testified she experienced prior to April 13, 1977, were a first attack of GBS which relapsed on April 13, 1977.

All of plaintiff's treating neurologists and most of the expert neurologists who testified, including Dr. Sheramata, agreed that the NINCDS Criteria are generally accepted in the medical community as the criteria for the diagnosis of GBS. A review of that criteria shows that the symptoms plaintiff experienced from mid-November, 1976 through mid-April, 1977; thirst, fever, blurry vision, dry cough, headaches and dizziness, are not the symptoms of GBS.

Raymond D. Adams, M.D., testified on behalf of the United States. Dr. Adams and Dr. Byron Wacksman first described experimental allergic neuritis (EAN), the animal model for GBS, in the medical literature in 1955. Dr. Adams has worked with GBS for the last 40 years. He is an editor of a textbook of medicine used throughout the world, Harrison's *Principles of Internal Medicine*, and co-author of Adams, Victor, *Principles of Neurology*, an authoritative and a widely used textbook of neurology. He is former Chairman of the Department of Neurology at Harvard Medical School and taught Dr. Arnason when he studied there. Dr. Adams testified that he has seen 25 to 30 cases of relapsing polyneuropathy in his career. He testified that in each episode or relapse there are unmistakable signs of peripheral nerve disease; sensory changes, tingling, numbness, weakness and reflex changes.

Dr. Adams testified that the symptoms plaintiff experienced from mid-November, 1976 to mid-April, 1977 are most commonly seen in individuals with a chronic infection such as bronchitis or in anxious depression. He testified that the symptoms "are not in any way indicative of peripheral nerve involvement." He further testified that those symptoms would not be recognized as symptoms of polyneuritis by the residents or staff at Harvard Medical School at Massachusetts General Hospital. Finally, Dr. Adams testified that in chronic relapsing polyneuritis, it would be inconsistent with his clinical experience, to see a patient whom, after several episodes, had an attack of the disorder so devastating that the plaintiff is put on a respirator. The treating neurologists, Drs. Richard A. Weaver and Allen O. Smith, also testified that plaintiff did not have chronic relapsing polyradiculoneuropathy.

In Prineas, McLeod, *Chronic Relapsing Polyneuritis*, J. Neurol. Sci. 27:427–458, 1976, the authors describe 23 patients with the rare disorder chronic relapsing polyneuritis. In each case described, obvious and clearly identifiable neurologic signs and symptoms were present during the chronic period. These symptoms were severe enough to require the patient to seek medical attention. The report does not describe the "subclinical disease" described by plain-

tiff, nor does it describe a single case with the course followed by plaintiff.

In Thomas, *et al., Recurrent and Chronic Relapsing Guillain-Barre Polyneuritis,* Brain 92:589–606, 1969, the authors describe 14 prior case reports of recurrent GBS found in a review of fifty years of medical literature and report five additional cases. In each case, the neurological symptoms were clearly identifiable and of such a nature as to demand medical attention. In no case is the indolent course followed by sudden fulminant onset described.

The Court finds that plaintiff's contention that she suffered GBS prior to mid-April, 1977, must be rejected because the overwhelming weight of medical evidence is to the contrary. Patients who suffer from the disorder of relapsing inflammatory polyradiculoneuropathy would at a minimum, require medical attention, which plaintiff required for the first time on April 13, 1977.

### B. *Chronic Inflammatory Polyradiculoneuropathy*

Alternatively, plaintiff contends that she experienced chronic inflammatory polyradiculoneuropathy shortly after she was vaccinated. Plaintiff's experts relied on the following passage from Dr. Arnason's description of "chronic inflammatory polyradiculoneuropathy (hypertrophic neuropathy)":

> The illness may begin as a mild distal weakness and progress at a slow tempo to quadriparesis. Alternatively it may progress for a time, become arrested or improve for an interval, and then resume its progressive course. Motor signs predominate at all times; frank involvement of cranial nerves is seldom seen. The illness may begin in one or another limb, which may be involved for a prolonged period before symptoms become more generalized. In some cases the deficit remains markedly asymmetrical throughout the course of the illness. . . . With the increasing use of electromyography to measure nerve conduction velocities, the presence of a considerable reservoir of mild indolent chronic neuropathy with symptoms insufficient to compromise the usual tasks of daily living has become increasingly evident. I suspect that

many such cases are mild forms of chronic inflammatory polyradiculoneuropathy and that the clinical spectrum of the disease may be considerably broader than formerly thought.

Dyck, et al., *Peripheral Neuropathy,* 1135 (1975).

In the same description, Dr. Arnason wrote:

> Most often, hypertrophic neuropathy begins insidiously and progresses gradually over months or years. (citation omitted).

*Id.*

Plaintiff's experts also relied on Hinman, Magee, *Guillain-Barre Syndrome with Slow Progressive Onset and Persistent Elevation of Spinal Fluid Protein,* Ann.Int.Med. 67:1007–1012, 1967. The authors describe four cases in which the onset of GBS was one of slow progression requiring several months for the symptoms to peak before recovery began. In each case, the neurological symptoms were of sufficient magnitude to cause the patient to seek medical attention. No case describes symptoms plaintiff described followed by an attack of acute GBS. The authors note that this disorder is rare, comprising two percent of the GBS patients seen at the University of Michigan Hospital from 1940 to 1963, and add that a "careful general and neurological examination is obviously necessary." *Id.* at 1011. Plaintiff did not visit a physician for symptoms until April 13, 1977.

Plaintiff's expert witnesses, Drs. Bellanti, Lewis, Nash and Sheramata did not refer to any case of chronic inflammatory polyradiculoneuropathy in the medical literature with the clinical course described by plaintiff during her direct examination. These experts relied on statements taken out of context from Chapter 56 in Dyck, *et al., Peripheral Neuropathy* (1975) authored by Barry G. W. Arnason, M.D. entitled *Inflammatory Polyradiculoneuropathies.* When the entire passages are considered, it is clear that plaintiff did not have the disorder of chronic or relapsing polyradiculoneuropathy.

Defendant's expert, Dr. Raymond D. Adams, has never seen a case of GBS, or chronic inflammatory polyradiculoneuropathy which proceeded at a sub-clinical level and, after four or five months, blossomed into an acute attack of GBS. Similarly, Edward A. Neuwelt, M.D., Assistant Professor of Neurosurgery and Biochemistry, University of Texas Medical School and co-author of the text Neuwelt, Clark, *Clinical Aspects of Neuroimmunology* (1978) testified that he is unaware of a single case of GBS, or chronic or relapsing inflammatory polyradiculoneuropathy with the clinical course described by plaintiff. Plaintiff's treating neurologists, Drs. Weaver and Smith testified that plaintiff did not have a chronic or relapsing inflammatory polyradiculoneuropathy, rather, she had GBS beginning on or about April 13, 1977.

### C. *Guillain Barre Syndrome*

Nearly all physicians agreed that the typical case of GBS begins paresthesias, or tingling and numbness of the distal portion of the extremeties. Paralysis progresses in an ascending fashion, to the trunk, and can affect the facial muscles and muscles which control breathing, bladder and bowel function. Patients may require endotracheal intubation, tracheostomy, catherization or other procedures. The expert testimony and medical literature demonstrate that the paralysis progresses to the peak of neurological involvement at a rapid pace, usually within four weeks, and recovery begins two to four weeks after progression stops.

Plaintiff visited her physician on April 13, 1977 complaining of stomach upset, headaches and numbness of her feet and arms. The following day she was hospitalized. Thereafter, she developed paralysis of her limbs, cranial, bladder and respiratory muscles. On May 1, 1977, plaintiff began to recover and she was discharged from the hospital on May 27, 1977. She improved after discharge without formal physical therapy, and at trial, suffered from residual facial paralysis and hand tremors.

The symptoms plaintiff and others testified she suffered from mid-November, 1976 to mid-April, 1977, such as muscle aches, blurry vision, fatigue, and feeling hot and thirsty do not appear in any medical record introduced at trial, including Dr. Mela's records and the detailed medical histories taken by plaintiff's attending physicians shortly after she was hospitalized at Bayfront Medical Center on April 14, 1977. The medical histories given by the plaintiff and her mother to the attending physicians during that hospitalization are inherently more reliable than the medical histories given during the litigation of this action.

Between mid-November, 1976 and mid-April, 1977, plaintiff attended college courses, walked through shopping malls, went dancing at discos, got married and went on her honeymoon. Drs. Bellanti, Lewis, Nash and Shermata referred to no case in the medical literature in which a person with GBS for a five month period was able to perform the activities of daily living and did not require medical attention. The testimony that plaintiff developed GBS or chronic or relapsing inflammatory polyradiculoneuropathy shortly after her inoculation is untennable in light of more than fifty years of experience the medical community has had with these disorders. The facts of this case demonstrate the onset of a classic, nearly textbook case of acute GBS in mid-April, 1977. Accordingly, the Court finds that plaintiff developed GBS on or about April 13, 1977, at the earliest on April 11, 1977, with a twenty one week interval between the influenza vaccination and plaintiff's GBS.

### D. $P_2$ *PROTEIN*

When $P_2$ protein combined with Freund's adjuvant is injected into experimental animals, they may develop experimental allergic neuritis (EAN), the model for GBS. Dr. Sheramata testified that he and others have tested certain lots of the swine influenza vaccine for $P_2$ protein and have yielded positive results. Five individuals have tested the swine influenza vaccine for $P_2$. Dr. Sheramata, Edwin H. Eylar, Ph.D. and Terrance Phillips, Ph.D. have tested the vaccine in using the Ouchterlony method, the polyaccrilamide gel and ELISA (enzyme linked immunoabsorbant assay) methods on behalf of various plaintiffs in the swine flu litiga-

tion. These scientists found $P_2$ protein in the swine flu vaccine by each of the three methods.

Steven Brostoff, Ph.D., a neurochemist, and John Whitaker, M.D., have tested the vaccine for myelin basic protein ("$P_1$ protein") and $P_2$ by radioimmunoassay and polyaccrilamide gel for the United States. No myelin basic protein or $P_2$ was found in any lot of vaccine tested.

Dr. Sheramata relied in large part on work with the vaccine and with monkeys performed on by others, principally Dr. Eylar. He admitted that the protocol for testing for $P_2$ protein by the ELISA method has not been published in medical literature. He also admitted that Dr. Eylar's work on another project has been criticized in the medical literature. *The EAE Model: A Tentative Connection to Multiple Sclerosis*, Nature 195:969–971, 1977. While EAN is thought to be an experimental model for GBS in humans, it is not directly analogous. Dr. Sheramata admitted that reactions to injections of $P_2$ and Freund's adjuvant differ among species of animals and even among different strains in the same species. Finally, Dr. Sheramata admitted that even assuming there is $P_2$ protein in the vaccine, recent literature, including an article authored by Dr. Eylar, has demonstrated that injection of $P_2$ protein without Freund's adjuvant may protect against a subsequent attack of EAN. McDermott, Keith, *Antigen-Induced Supression of Experimental Allergic Neuritis in the Guinea Pig*, J. Neurol. Sci., 46:137–143, 1980; Eylar, *et al.*, *Suppression of Immune Response: Reversal of the Disease State With Antigen in Allergic Encephalomyelitis*, Nature, 236:74–76, 1972. Plaintiff's experts did not testify that the swine influenza vaccine contained Freund's adjuvant.

The United States' expert witness, Steven W. Brostoff, Ph.D., a neurochemist and Professor of Basic and Clinical Immunology and Microbiology at the Medical University of South Carolina, tested the vaccine for $P_2$ protein principally by radioimmunoassay. The protocol for this test was developed by him and others and is published in the medical literature. Sarvas, et al., *Radioimmunoassay for the $P_2$ Protein of Bovine Peripheral Nerve Myelin*, J. Immunology 124:557–564, 1980. Dr. Brostoff testified that the radioimmunoassay for $P_2$ protein is approximately one thousand times more sensitive than the ELISA method used by Dr. Sheramata's colleagues. He testified that the radioimmunoassay is the most sensitive test for $P_2$ at the present time. It detects $P_2$ to quantities of one nanagram, which is one billionth of a gram. Both the radioimmunoassay and polyaccrilamide gel tests performed by Dr. Brostoff showed no evidence of $P_2$ in any swine influenza vaccine lot tested. Dr. Brostoff has also worked with EAN animals in the lab. He testified that the longest interval between injection of $P_2$ with Freund's adjuvant and onset of EAN he has seen is thirty one days, or four and one half weeks, which is consistent with the observations reported in the medical literature.

The Court concludes that injection of large amounts of $P_2$ protein into animals is not determinative, with any degree of certainty, as to what would result if $P_2$ were contained in the swine influenza vaccine administered during the National Influenza Immunization Program of 1976. The methods used by Dr. Brostoff in testing for $P_2$ protein in the vaccine are more reliable and more sensitive than the methods used by Dr. Sheramata and his colleagues. The Court notes that the testimony presented by the plaintiff on this issue has been considered and rejected by another court. *Haussler v. United States*, Civil No. 79–2031–A (E.D.Va., March 17, 1981), plaintiff has not proved by a preponderance of evidence that the swine flu vaccine used during the Program and administered to her contained $P_2$ protein, nor has she proved that the presence of $P_2$ protein would have caused her GBS.

### E. Epidemiology

Most experts agreed that there is no test which can be performed to determine the etiology of GBS in a single case. Therefore, we must consider epidemiology in determining whether the swine influenza vaccination was the cause of plaintiff's GBS. The principal study on this subject is a

report of the epidemiologic surveillance conducted by the Center for Disease Control ("CDC") during the Swine Flu Program. Schoenberger, *et al., Guillain Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States,* 1976–1977, Am.J.Epidem. 110:105–123, 1977. The CDC surveillance was initiated on October 1, 1976 to evaluate possible adverse reactions to the swine influenza vaccine. By December 21, 1976, two clusters of GBS had been reported in recent recipients of the vaccine. As a result of the identification of the clusters through the surveillance system, CDC investigated the possibility of a relationship between the vaccine and GBS. One thousand ninety eight patients with onset of GBS between October 1, 1976 and January 31, 1977 were studied. Five hundred thirty two of these patients had received the swine influenza vaccination.

The authors concluded that the period of increased risk of GBS was concentrated primarily within the five week period after vaccination, although it lasted for eight to ten weeks. The primary author of that study, Dr. Schoenberger, gave the following testimony during his multidistrict deposition regarding the results of his study:

| Week after vaccination | Percent chance that GBS was caused by vaccination |
|---|---|
| 1 | 79.0 |
| 2 | 92.2 |
| 3 | 93.5 |
| 4 | 82.0 |
| 5 | 75.6 |
| 6 | 52.0 |
| 7 | 61.5 – 75.0 |
| 8 | 56.5 – 57.0 |
| 9 | 48.7 – 49.0 |
| 10 | 46.5 |
| 11 | No relation because |
| 12 | increased risk disappears. |

The CDC study was criticized by Milton Alter, M.D., an epidemiologist and Chairman of the Department of Neurology at Temple University in Philadelphia. Dr. Alter testified that the period of surveillance, which lasted through January 31, 1977, was not long enough and that some states relaxed or stopped GBS surveillance after December 18, 1976. He also concluded that

had the surveillance continued beyond January 31, 1977, the relative risk of developing GBS would have extended beyond the eight to ten weeks reported by CDC.

Willard Allen Hauser, M.D., an epidemiologist and Associate Professor of Neurology at the Gertrude A. Sergievsky Center College of Physicians and Surgeons, Colombia University, New York, testified that an increased risk of GBS extending eight to ten weeks is somewhat longer than the previously accepted time interval between GBS and antecedent events. He testified that the background rate in the CDC study is lower than the background rate previously reported in the United States.[3] Dr. Hauser testified that the background rate in the CDC study is probably biased in favor of the vaccinated GBS population. Dr. Hauser testified that although the data from nine states was dropped from the study because of a decrease in case ascertainment, this did not vitiate the results of the study because of the large number of patients involved. He explained that the surveillance was terminated on January 31, 1977, nearly two weeks after the rate of GBS in the vaccinated population fell to the rate of GBS in the unvaccinated population. Dr. Hauser also relied on an independent analysis of the CDC data by Alexander Langmuir, M.D. Langmuir, *Guillain Barre Syndrome: The Swine Influenza Virus Vaccine Incident in the United States of America, 1976–1977,* J.Roy.Soc.Med. 72:660–668, 1979. Dr. Langmuir's analysis yielded the same results as the CDC study.

Dr. Hauser also relied on the results of surveillance for GBS in the state of Michigan for the nine month period from July, 1976 to April, 1977. Hayner, *et al., Relationship of Guillain Barre Syndrome to Influenza Vaccination and Other Factors in Michigan, 1976–1977.* The study involved one hundred ten GBS patients of which thirty nine were inoculated with the swine influenza vaccine. The Michigan study reported an increased incidence of GBS for six weeks following vaccination.

3. Lesser, *et al., Epidemiologic Features of Guillain Barre Syndrome,* Neurology 23:2369–2372, 1973; Kennedy, *et al., Guillain Barre Syn-*

drome: *A 42 Year Epidemiologic and Clinical Study,* Mayo Clinic Proc. 53:93–99, 1978.

Dr. Alter's criticisms of the CDC surveillance have been considered. However, he offered no epidemiologic data or accepted medical thought sufficient to show that the period of increased risk lasts beyond ten weeks. His conclusion that the period of risk extends beyond ten weeks after vaccination is speculative. Three epidemiologic studies were introduced by the defendant. These studies show that the period of increased risk of GBS lasts from six to ten weeks after vaccination. The conclusions of these studies are consistent with accepted medical thought on the time interval between GBS and its antecedent events.

The Court finds that plaintiff developed GBS twenty one weeks after her inoculation and that the swine influenza vaccine did not cause her GBS. This decision is in accord with other reported decisions. *Alvarez v. United States,* 495 F.Supp. 1188 (D.Colo.1980); *Hixenbaugh v. United States,* 506 F.Supp. 461 (N.D.Ohio 1980); *Lima v. United States,* 508 F.Supp. 897 (D.Colo.1981).

By order entered July 1, 1981, the Court announced its general Findings and decision herein and requested counsel of the defendant to furnish proposed Findings supporting the decision. The above, supplied by Ms. Mary Ann Murphy, Trial Attorney with the Torts Branch of the Department of Justice is the result. The Court has carefully considered the same and adopts them without reservation. Ms. Murphy is commended for the quality thereof.

## CONCLUSION

The plaintiff has not proven by a preponderance of the evidence that the swine influenza vaccine she received on November 16, 1976 was the proximate cause of the GBS she developed twenty one weeks later on April 13, 1977. The Clerk of Court is directed to enter judgment in favor of the defendant, with its costs of action.